COMMISSIONER OF INTERNAL REVENUE

v.

THE CHARLESTON NAT. BANK, CHARLESTON, W. VA.

No. 6755.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1954.

Decided May 19, 1954.

Karl Schmeidler, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Alonzo W. Watson, Sp. Assts. to Atty. Gen., on brief), for petitioner.

Charles M. Love, Charleston, W. Va. (Dayton, Campbell & Love, Charleston, W. Va., on brief), for respondent.

Before PARKER, C. J., and SOPER and DOBIE, JJ.

SOPER, Circuit Judge.

The question in this case is whether, as the Tax Court held (20 T.C. 253), the Charleston National Bank, in computing its income tax for the years 1944 and 1945, was entitled to deduct as ordinary and necessary business expenses under § 23(a) of the Internal Revenue Code, 26 U.S.C.A., certain premiums which it paid in those years on life insurance policies held by it as collateral security for monies loaned by it to the insured.

The taxpayer is a national banking institution with its office and place of business in the City of Charleston, West Virginia. Its federal income and excess profits tax returns for 1944 and 1945 were filed on a cash basis with the Collector of Internal Revenue.

For more than twenty years prior to 1930, the Kanawha Bank, a national banking association, was located in Charleston, West Virginia. From that time until the close of business on Saturday, November 15, 1930 it was engaged in the general banking business. The Charleston National Bank, likewise a national banking association, was also located in Charleston, West Virginia. From 1884 until November 15, 1930 it was engaged in the general banking business.

As of the close of business on Saturday, November 15, 1930, and in accordance with the provisions of the National Bank Act, 44 Stat. 1224, and with the approbation of the then Comptroller of the Currency, the two banks were consolidated, with a capital stock of $1,062,-500. Beginning on November 17, 1930 the business of both banking associations was conducted under the corporate title of "The Charleston National Bank."

The records of the Kanawha National Bank showed that prior to 1924 one F. L. Middleton was indebted to it as the maker of promissory notes in the sum of $24,000 which were secured by a deed of trust upon certain residential property. Also, Middleton was the endorser of an unsecured note of $15,000 which the Bank charged to profit and loss on June 30, 1923. In the early part of 1924 Middleton went into bankruptcy and the Kanawha National Bank filed its claims for both the secured and the unsecured indebtedness of $24,322.70 and $16,203.73 respectively. The secured claim was fully paid. In the fall of 1929 a first and final liquidating dividend was paid. Kanawha received $928.10 which it credited to profit and loss on November 16, 1929.

During World War I, three brothers, E. M. Cox, O. J. Cox and W. R. Cox were actively engaged in the coal mining business in West Virginia, and were the principal stockholders and chief executive officers of several coal corporations in that area. The Cox Brothers were individually liable as endorsers on notes held by the Kanawha Bank, on which notes the aforementioned corporations were either makers or endorsers thereof in the sum of $58,208.09, and this amount too was charged to the Bank's profit and loss on May 4, 1925.

The three Cox brothers were also severally and/or jointly liable to the Kanawha Bank on notes amounting to $23,483.50 and $4,161.50 respectively, which amounts were also charged to the Bank's profit and loss on May 4, 1925 and November 4, 1925 respectively. The Cox brothers were adjudicated individual bankrupts and discharged prior to April 27, 1927. No part of their indebtedness was paid prior to or during the taxable years 1944 and 1945 inclusive.

Upon the consolidation of Kanawha National Bank with the Charleston National Bank on November 15, 1930, the Charleston National Bank, the taxpayer here, received life insurance policies on the lives of each of the Cox brothers and Middleton. These policies had been previously assigned to the Kanawha Bank as security for the loans to each respective debtor. Prior to 1931 these policies had no cash surrender value. But the status of these policies in the taxable years 1944 and 1945 inclusive was as follows:

|  | Face Amount | Cash Sur. Value 1944 | Cash Sur. Value 1945 | Premiums Paid 1944 | Premiums Paid 1945 |
|---|---|---|---|---|---|
| F. L. Middleton.. | $14,000 | $ 4,463.08 | $ 4,853.80 | $ 738.64 | $ 722.12 |
| W. R. Cox...... | 20,000 | 5,500.00 | 5,900.00 | 456.20 | 456.20 |
| O. J. Cox ....... | 20,000 | 6,100.00 | 6,540.00 | 511.00 | 511.00 |
| E. M. Cox....... | 10,000 | 4,250.00 | 4,490.00 | 383.60 | 381.30 |
|  | $64,000 | $20,313.08 | $21,783.80 | $2,089.44 | $2,070.62 |

The Charleston National Bank paid the premiums on all of the above policies from 1931 to and including 1945. With the exception of 1932 the Bank claimed and the Commissioner allowed these paid premiums to be treated as expense deductions for the years 1931 to 1939 inclusive. For the years 1940 and 1941 the Bank claimed the same deductions, but the Commissioner disallowed them.

In 1942 the Charleston Bank claimed no deduction on its return for the insurance premiums which it had paid, but it did file for a refund of $2,101.32 in 1942, which the Commissioner allowed, and a refund was made in the amount of $840.53. Moreover, for the years 1943, 1944 and 1945 the Bank made no claim for a deduction of the insurance premiums paid. It was not until June 6, 1947 that the taxpayer-Bank, in a protest filed with the Commissioner, first made claim that it was entitled to deduct the premiums paid in 1944 and 1945 as business deductions. The Commissioner, however, disallowed this claim.

It thus appears that the premium payments were taken as deductions in all of

the years except 1940, 1941, 1943, 1944 and 1945. The payments in these years reached a total of $8,388.68 in 1944 and $10,459.30 in 1945. The total cash surrender values were $20,313.08 in 1944 and $21,783.80 in 1945. Hence if the taxpayer-Bank had elected to collect the cash surrender values in one of these years it would have received $11,924.40 in 1944 or $11,324.50 in 1945 in excess of the premiums which had not been allowed in previous years as deductions.

However, the cash surrender values in these years were far less than the total premiums which the Bank had paid at the rate of approximately $2,000 annually during the period from 1931 to 1945 inclusive; and the increases in cash surrender value in 1944 and 1945, i. e. $1456.08 and $1470.72 respectively were substantially less than the premiums paid in those years.

When the case came before the Tax Court it ruled against the Commissioner with respect to the taxable years 1944 and 1945, here involved. That court concluded that the premiums paid in 1944 and 1945 by the taxpayer qualified as ordinary and necessary business expenses incurred and paid in the carrying on of the taxpayer's business in those years; and further that "the facts presented in the instant case bring it within the ambit of Dominion National Bank, supra." Dominion Nat. Bank v. Commissioner of Internal Revenue, 26 B.T.A. 421. It is from this ruling of the Tax Court that the Commissioner takes this appeal.

The Commissioner argues that when the Bank charged off the debts it must have shown them in its return as bad debt deductions, so that the Bank's cost basis for its interest in the policy at that time (when the policies had no cash surrender value) became zero. Hence if the policies should be paid in the future, the proceeds would be taxable income, and only the premiums not charged off could be added to the taxpayer's basis. The Commissioner says in this connection that the proceeds of the policies would be considered separate and apart from the previously charged off debts.

The Commissioner relies on the principle expressed in G.C.M. 14375, XIV–1 Cum.Bull. 52 (1935) that when a debtor assigns a life insurance policy as security for a debt and nothing is said in the assignment as to reimbursing the creditor for premiums paid by him, the creditor has the right to pay the premiums and to reimburse himself therefor from the proceeds of the policy; but the premiums paid are not deductible unless the right of reimbursement is worthless in the year of payment. In the pending case, the taxpayer in 1944 and 1945 had the power to collect the cash surrender value of the policies and thus receive more than the premiums paid in these years and in the preceding years in which the premiums had been charged off. In addition the Commissioner contends that the premium payments in 1944 and 1945 substantially increased the value of an asset held by the taxpayer, and hence must be regarded as investments of capital and were not deductible in those years as ordinary and necessary business expenses.

These contentions do not convince us that the Tax Court was wrong in its finding that the premiums paid in 1944 and 1945 were ordinary and necessary business expenses of the Bank within the meaning of § 23(a) (1) (A) of the Internal Revenue Code. It is not easy in every case to determine whether an expenditure is an ordinary and necessary expense in the course of carrying on a trade or business or an investment of capital. Experienced and trained accountants often find the decision of such a question difficult in a given case and it is interesting to note that in the present instance neither the Commissioner nor the taxpayer has followed a consistent course in accounting for the premiums paid by the taxpayer during the period 1931 to 1945.

The conclusion which the Tax Court has reached is supported by its prior decisions and the decisions of the courts in this field. Therein it has been held

that premiums on a life insurance policy paid by a creditor who holds the policy as collateral for a debt owing by the insured, constitute ordinary and necessary expenses incident to the protection of the collateral in the usual course of the creditor's business. See First National Bank & Trust Co. of Tulsa v. Jones, D.C.W.D. Okl., 53 F.Supp. 842, affirmed, 10 Cir., 143 F.2d 652; Federal National Bank of Shawnee v. Commissioner, 16 T.C. 54, on remand from the 10 Cir., 180 F.2d 494; Dominion National Bank v. Commissioner, 26 B.T.A. 421.[1]

In the last cited case, Dominion National Bank v. Commissioner, 26 B.T.A. 421 at page 423, the court said:

"While it is true that the assignee of a policy of life insurance which he holds to secure a debt of the insured may retain out of the proceeds a sufficient amount to reimburse him for premiums paid plus interest in addition to the amount of the debt, First National Bank of Roanoke v. Speece, 99 Va. 194, 37 S.E. 843, it is also true that petitioner here was under no duty to continue paying the premiums. It might have allowed the policies to lapse at any time, and taken the cash surrender value of the amount less than the debt. In that event it would not have been reimbursed for its expenditures for premiums. It is well known that the cash surrender value of life insurance does not increase dollar for dollar with the premium paid. We regard the premiums paid as an ordinary and necessary expense incurred by petitioner with the hope of ultimately recovering the full amount of the indebtedness, and in our opinion the payments made in 1928 aggregating $596.56 should be allowed as a deduction."

We do not regard the ability of the taxpayer to recover the premiums paid in 1944 and 1945 out of the cash surrender values of the policies, if it sees fit to do so, or the increase in the cash surrender values as the result of these payments as controlling in this case.[2] Not infrequently money spent by a taxpayer in the improvement or preservation of an asset increases its value to some extent and may be recovered and yet the expenditure may still be regarded as a current expense rather than a capital outlay. The decision whether the amount may be charged off in the taxable year or must be added to the cost basis of a capital asset is not found in a single phrase or rule of thumb; it depends upon the nature of the business and the factors involved; and we cannot say that the Tax Court was wrong in concluding that the cost incurred by the creditor bank in the preservation of its collateral by the payment of annual premiums which had no direct relation to the surrender values of the contract should be regarded as part of the running expenses of the Bank's business, since the determination of the question necessarily depends upon the facts of the particular case and the conclusion of the expert administrative authority is entitled to great weight.

The Commissioner invokes the general principle that an expenditure intended to yield benefits to a business over a period of years is a capital expenditure which is ordinarily not deductible; but if deductible at all, must be amortized over the years in which the benefits are received. But the facts of the cases in which this principle has been given effect

---

1. In King Plow Co. v. Commissioner, 5 Cir., 110 F.2d 649 and St. Louis Refrigerating & Cold Storage Co. v. United States, 8 Cir., 162 F.2d 394, it was held that the proceeds of a life insurance policy assigned to the taxpayer were not exempt from taxation under § 22(b) (1) and (b) (2) of the Code, and the deductibility under § 23(a) of premiums paid by the assignee was not considered.

2. The cash surrender values of the policies in 1944 and 1945 were more than enough to cover the premiums paid which had not been charged off by the taxpayer; but it was not sufficient to reimburse the taxpayer for all the premiums paid or for the principal indebtedness.

differ so markedly from those in the case at bar that the decisions support rather than conflict with the decision of the Tax Court now under review. For example in Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212, the payments were made by the secretary of a bankrupt corporation to its former customers in order to obtain their good will and credit in his own business; in Gauley Mountain Coal Co. v. Commissioner, 4 Cir., 23 F.2d 574, and in Colony Coal & Coke Corp. v. Commissioner, 4 Cir., 52 F.2d 923, large sums were paid by the coal companies to a railroad company in consideration of the railroads building a branch line to the taxpayer's coal lands, and in Clark Thread Co. v. Commissioner, 3 Cir., 100 F.2d 257, funds were paid by the taxpayer to a competitor to secure the discontinuance by him of a trade name similar to that of the taxpayer.

The decision of the Tax Court is Affirmed.