*Decision will be entered under Rule 50.*

MERCANTILE NATIONAL BANK AT DALLAS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57631, 65927. Filed April 22, 1958.

*Edward L. Wilson, Esq.,* and *Hubert D. Johnson, Esq.,* for the petitioner.

*Paul M. Newton, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income and excess profits taxes for the calendar years, and in the amounts as follows:

| | | |
|---|---|---|
| 1951 | Income tax | $8,282.98 |
| 1952 | Income and excess profits tax | 61,777.97 |
| 1953 | Income and excess profits tax | 24,459.69 |

The major portion of the excess profits tax deficiencies arises out of the respondent's action in increasing excess profits net income by the amounts recovered in the taxable years on account of debts which had either been charged off as bad debts or had been charged to the reserve for bad debts in prior excess profits tax years. The action of the respondent in so increasing excess profits net income is assigned as error. This issue is also raised for the year 1950 which is before us because of an unused excess profits carryover from that year to the taxable years.

The petitioner contends alternatively that its deduction for bad debts in 1950 resulted in a tax benefit, at the most, of only $184\frac{3}{365}$ thereof, and that therefore no more than that proportion of amounts recovered on account thereof in 1951, 1952, and 1953 should be included in excess profits net income of such latter years.

Other issues concern deductions for the costs of a club membership, relocating its building manager's office, and replacing a lighting system.

### FINDINGS OF FACT.

Most of the facts were stipulated and are incorporated herein by this reference.

The petitioner is a national bank incorporated in 1933 and has been doing business since that date under the laws of the United States, with principal office and place of business in Dallas, Texas. It timely filed corporation income and excess profits tax returns for the calendar years 1950, 1951, 1952, and 1953 with the collector or director of internal revenue at Dallas.

The petitioner regularly reports its income on the cash method of accounting, except with respect to bad debts. Prior to the calendar year 1944 the petitioner deducted specific bad debt items from gross income when determined to be worthless and included in gross income when received recoveries of bad debts previously deducted. In 1944 the respondent granted the petitioner's request to employ the reserve method of accounting for bad debts for Federal income tax purposes beginning with the calendar year 1944. On its income tax return for the year 1944 the petitioner adopted the reserve method and has employed that method of accounting for bad debts for Federal income tax purposes regularly since that year. Under the reserve method a reasonable reserve for bad debts was deductible by the petitioner in computing taxable income for the year 1944, and a reasonable addition thereto was deductible in computing taxable income for each subsequent year. Under that method debts are charged to the reserve when determined to be worthless and recoveries of bad debts previously charged to the reserve are credited to the reserve when received. On its income tax return for the year 1947, the petitioner adopted the 20-year moving average method of determining annual additions to the reserve for bad debts.[1] The petitioner has employed the 20-year moving average method of determining the annual additions to the reserve for bad debts regularly since 1947 and during each of the calendar years 1951, 1952, 1953.

---

[1] This method was adopted in accordance with the provisions of. Mim. 6209, 1947-2 C. B. 26.

The reasonable addition to the petitioner's reserve for bad debts for each of the years 1951, 1952, and 1953 computed under the 20-year moving average method was as follows:

| | |
|---|---|
| 1951 | $471, 024. 63 |
| 1952 | 408, 968. 13 |
| 1953 | 226, 161. 46 |

The petitioner claimed and the respondent allowed these amounts as deductions in the computation of net income for purposes of the normal tax and the surtax. During each of the years 1951, 1952, and 1953 the petitioner recovered specific debts, which had been determined to be worthless and either deducted from gross income (before 1944) or charged to the reserve (since 1943), as follows:

| | |
|---|---|
| 1951 | $123, 160. 36 |
| 1952 | 159, 288. 57 |
| 1953 | 113, 655. 12 |

The amounts of these recoveries were properly credited to the reserve for bad debts but were not includible in net income for purposes of the normal tax and surtax.

During each of the years 1951, 1952, and 1953 specific debts owing to the petitioner became worthless in the following amounts:

| | |
|---|---|
| 1951 | $394, 631. 38 |
| 1952 | 67, 609. 68 |
| 1953 | 446, 734. 28 |

The amounts of these worthless debts were properly charged to the reserve for bad debts but were not deductible in computing net income for purposes of the normal tax and surtax.

In its excess profits tax returns for the years 1951, 1952, and 1953 the petitioner determined its excess profits net income by deducting the amount of the specific worthless debts which had been charged to the reserve for bad debts during each year in lieu of the amount allowable under the reserve method. This adjustment was made on Schedule EP-1 filed for each year by adding to normal tax net income the amount allowable under the reserve method and deducting the amount of the specific worthless debts.

In the notice of deficiency the respondent has increased the excess profits net income of the petitioner for each of the years 1951, 1952, and 1953 by taking into account in each year the recoveries of debts charged to the reserve in prior years, in amounts as follows:

| | |
|---|---|
| 1951 | $87, 685. 53 |
| 1952 | 113, 677. 59 |
| 1953 | 93, 625. 51 |

In each year the aforesaid amount was computed by subtracting from the total bad debt recoveries during the year ($123,160.36 in 1951;

$159,288.57 in 1952; $113,655.12 in 1953) the amount of such recoveries relating to debts which had been deducted from gross income during taxable years beginning before January 1, 1940, or charged to the reserve for bad debts for years beginning after December 31, 1945, and ending before July 1, 1950 ($35,474.83 in 1951; $45,610.98 in 1952; $20,029.61 in 1953).

The bad debt recoveries by which the respondent has increased the petitioner's excess profits net income for each of the years 1951, 1952, and 1953 include those on debts originally charged to the reserve for bad debts during the taxable year 1950. The amounts so included are as follows:

| | |
|---|---|
| 1951 | $83,247.58 |
| 1952 | 74,585.79 |
| 1953 | 72,448.54 |

The reasonable addition to the petitioner's reserve for bad debts for the year 1950, computed under the 20-year moving average method, was $541,806.31. During the year 1950 the petitioner recovered specific debts which in prior years had been determined to be worthless and either charged to the reserve (since 1943) or deducted from gross income (before 1944) in the total amount of $121,151.21. Of this amount, specific debts were recovered which had been determined to be worthless in the years 1940 through 1945, as follows:

| Year of deduction | Amount of recovery in 1950 |
|---|---|
| 1940 | $160.64 |
| 1941 | 2.50 |
| 1942 | 59.68 |
| 1943 | 35.00 |
| 1944 | 3,797.75 |
| 1945 | 28,691.05 |
| Total | 32,746.62 |

During the year 1950 certain specific debts of the petitioner became worthless in the amount of $848,041.83, which were charged to the reserve for bad debts but were not deducted in computing net income subject to normal tax and surtax. In its excess profits tax return for the year 1950, the petitioner determined its excess profits net income by deducting this amount in lieu of the amount allowable as a reasonable addition to the reserve.

The respondent determined that the excess profits net income of the petitioner for 1950 should be increased in the amount of the recoveries of debts which had been deducted from gross income (before 1944) or charged to the reserve (since 1943) during the years 1940 through 1945, totaling $32,746.62. As a result of this determination, the respondent further determined that the petitioner

had an unused excess profits credit of $326,942.45 for the year 1950 and that $164,822.71 ($^{184}/_{365}$ of $326,942.45) thereof was subject to carryover to the year 1951 under the provisions of section 432 (c) (2) of the Internal Revenue Code of 1939. The excess profits net income of the petitioner for 1950, as adjusted by the respondent (including the adjustment with respect to bad debt recoveries in 1950 above described) was $1,416,684.88. The excess profits credit of the petitioner for 1950 was $1,743,627.33.

### Club Membership.

On January 23, 1951, the petitioner paid $670 to the Dallas Athletic Club. This amount represented the following items:

| | |
|---|---|
| Initiation fee | $350 |
| Certificate of membership and beneficial interest | 200 |
| Dues for one month | 10 |
| Federal excise taxes | 110 |
| Total | 670 |

The club membership has, ever since its acquisition in 1951, been used by an officer of the petitioner in connection with the business of the petitioner.

The certificate of membership and beneficial interest issued by the club to the petitioner contained the following provisions:

Upon the death, resignation, or expulsion of a member, or upon termination for delinquency, this certificate shall be presented to the corporation within ninety days and may be redeemed and cancelled by payment to the holder or his legal representatives of the value of such certificate as determined by the Board of Directors. All certificates shall be redeemed in the order presented to the corporation and only as provided in the by-laws, and not out of the general assets of the corporation. * * *

The bylaws of the Dallas Athletic Club contained the following provisions:

Section 2—Resident Members.

Any male person over twenty-one years of age shall be eligible to resident membership. Resident membership shall be limited to persons residing in the County of Dallas. Resident members shall each pay an initiation fee of $350.00 together with Federal tax and dues of $100.00 per annum, together with Federal tax. Said initiation fee shall be in addition to such cost of membership certificate as may be from time to time fixed by the Board of Directors.

Section 3—Corporation Members.

An individual, corporation or partnership, may upon the payment of $350.00 initiation fee designate one representative in his or its employ for membership, who upon election to membership shall have the rights and privileges of a resident member. * * *

Section 7—Cancellation of Certificates.

If at the time any certificate is delivered for re-issuance no application has been accepted for new membership, the Board of Directors may cancel the certificate so delivered by ordering payment and paying to the former holder thereof, his heirs, executors, administrators or assigns, the amount which would otherwise have been paid by any such new member. Such certificate shall be held in the Club Treasury until a new member shall have qualified for such certificate. Provided that the Board of Directors shall create a fund from initiation fees hereinafter received, and no such payment shall ever be made for a certificate canceled, as provided in this Section 7, except out of such fund so created, and never out of any other assets of the Club.

The respondent disallowed the amount of $670 which had been claimed by the petitioner as a deduction in its income tax return for the year 1951.

## Cost of Relocating Manager's Office.

The petitioner owns the Mercantile Bank Building in Dallas and leases to tenants for offices that portion of the building which it does not occupy for banking purposes. At the beginning of the year 1951 a portion of the 27th floor of the building was occupied by the building manager's office and the balance was occupied by a tenant of long standing. The tenant was crowded for space and for some time had attempted to acquire the space occupied by the building manager on that floor. In 1950 and early 1951 leases on the 28th floor expired and the tenants had vacated by April 30, 1951. At that time the building manager agreed to move his office to a part of the 28th floor in order to accommodate the tenant on the 27th floor who desired to have more space. An arrangement was entered into between the building manager and the 27th floor tenant whereby the tenant agreed to reimburse the petitioner for the cost of specific items which would be involved in moving the manager's office. The manager's office was moved to the 28th floor during the year 1951 and in connection therewith the following costs were incurred and paid by the petitioner:

| | |
|---|---|
| Mechanical and architectural plans | $300. 00 |
| Plumbing | 2, 418. 30 |
| Tile and tile installation | 1, 399. 35 |
| Marble and marble installation | 324. 96 |
| Doors and millwork | 864. 50 |
| Glass and mirror | 441. 52 |
| Plaster work | 3, 997. 04 |
| Sofa | 520. 00 |
| Sofa recovering | 200. 00 |
| Chair | 84. 50 |
| Restroom fixture | 16. 30 |
| Acoustic ceiling | 496. 50 |
| Carpet | 744. 00 |
| Rubber tile, cork, and linoleum | 1, 028. 45 |

| | |
|---|---|
| Moving of elevator panel board | $1,225.00 |
| Hardware, locks, and keys | 202.49 |
| Draperies | 413.96 |
| Duct work | 2,681.47 |
| Hauling trash | 50.00 |
| Maid service | 32.23 |
| Labor by building employees: | |
| Carpentry | 2,934.49 |
| Painting | 1,353.58 |
| Electrical | 1,005.95 |
| Taxes and insurance | 171.53 |
| Total | 22,906.12 |

The tenant on the 27th floor reimbursed the petitioner for $10,300 of the above costs. The amount of space occupied by the building manager's office on the 28th floor was approximately the same that that office had occupied on the 27th floor.

The costs of a sofa in the amount of $520 and of a chair, $84.50, are conceded by the petitioner to be nondeductible costs.

The remaining net amount of $12,001.62 expended by the petitioner for moving its manager's office did not represent ordinary and necessary business expenses.

*Lighting System.*

When the Mercantile Bank Building was constructed in 1945 the petitioner was unable to obtain proper fixtures to furnish adequate lighting for the first floor of the building. A light trough was installed at that time in which were placed fluorescent lights end to end on both sides of the building arcade. That lighting proved to be unsatisfactory. The fluorescent tubes soon began to flicker and made undesirable shadows and reflections on the ceiling, and required frequent replacement. In 1951 the fluorescent fixtures, including chassis, tubes, and wiring, were removed. In place thereof the petitioner installed a cold cathode lighting system which consisted of a continuous tube that extends around the lobby. The energy consumed by the new system is less than the old, and maintenance work is negligible.

The cost of installing the new lighting system was $2,253, which amount was claimed as an expense deduction by the petitioner in its 1951 income tax return. The deduction was disallowed by the respondent.

The lighting system installed in 1951 was a permanent improvement or betterment.

OPINION.

The principal issue is whether the respondent erred in increasing the petitioner's reported excess profits net income for the years

1950,[2] 1951, 1952, and 1953 by the amounts of recoveries in those years of debts which had been deducted or charged to a reserve for bad debts in prior excess profits tax years. The statute involved is section 433 of the Internal Revenue Code of 1939,[3] as added by section 101 of the Excess Profits Tax Act of 1950.

The petitioner employed the reserve method of accounting for bad debts. Under that method debts which became worthless were charged to the reserve, recoveries on bad debts were credited thereto, and the deduction to which the petitioner was entitled, in computing normal tax net income, was a reasonable addition to the reserve, computed on the 20-year moving average method, as provided in Mim. 6209, 1947-2 C. B. 26.[4] Under the reserve method bad debt recoveries are not includible in gross income for the purpose of computing the normal tax net income and surtax net income although they are reflected therein because crediting them to the reserve re-

---

[2] While no deficiency was determined for the year 1950, that year is involved because of the carryover of an unused excess profits credit for that year.

[3] SEC.433. EXCESS PROFITS NET INCOME.

(a) TAXABLE YEARS ENDING AFTER JUNE 30, 1950.—The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year increased or decreased by the following adjustments:

(1). ADJUSTMENTS.—

\* \* \* \* \* \* \*

(G) Recoveries of Bad Debts.—There shall be excluded income attributable to the recovery of a bad debt if the deduction of such debt was allowable from gross income for any taxable year beginning before January 1, 1940, or beginning after December 31, 1945, and ending before July 1, 1950, or if such debt was properly charged to a reserve for bad debts during any such taxable year;

\* \* \* \* \* \* \*

(L) Bad Debts in Case of Banks.—In the case of a bank (as defined in section 104) using the reserve method of accounting for bad debts, there shall be allowed, in lieu of the amount allowable under the reserve method for bad debts, a deduction for debts which became worthless within the taxable year, in whole or in part, within the meaning of section 23 (k);

[4] Mim. 6209 states in part as follows:

The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of 20 years, including the taxable year, as representing a sufficiently long period of a bank's experience to constitute a reasonable cycle of good and bad years. The percentage so obtained, applied to loans outstanding at the close of the taxable year, determines the amount of permissible reserve in the case of a bank changing to the reserve method in such year \* \* \* and the minimum reserve which the taxpayer will be entitled to maintain in future years \* \* \*. A bank, following a change to the reserve method of accounting for bad debts, may continue to take deductions from taxable income equal to the current moving average percentage of actual bad debts times the outstanding loans at the close of the year, or an amount sufficient to bring the reserve at the close of the year to the minimum mentioned above, whichever is greater. Such continued deductions will be allowed only in such amounts as will bring the accumulated total at the close of any taxable year to a total not exceeding three times the moving average loss rate applied to outstanding loans. \* \* \*

\* \* \* \* \* \* \*

Bad debt losses sustained are to be charged to the reserve, and recoveries made of specific debts which have been previously charged against the reserve by a bank on the reserve method of treating bad debts should be credited to the reserve.

duces the reasonable addition to the reserve which would otherwise be allowable as a deduction. See *Boyd-Richardson Co.*, 5 T. C. 695, and *Zellerbach Paper Co.*, 8 T. C. 511. There is no dispute as to the normal tax net income of the petitioner for any of the years insofar as bad debt deductions and recoveries are concerned.

Section 433 (a) makes the starting point in the computation of the excess profits net income the normal tax net income, and provides in detail for adjustments thereto by specified increases or decreases. Subparagraph (L) specifically deals with the treatment of bad debts in the case of banks using the reserve method of accounting for bad debts. It provides that there shall be allowed, in lieu of the amount allowable under the reserve method of accounting for bad debts, a deduction for debts which became worthless in whole or in part within the meaning of section 23 (k). Petitioner, in computing its excess profits net income, complied with this provision, and the regulations promulgated pursuant thereto,[5] adding back to normal tax net income the deductions which it had taken under the reserve method, and deducting actual bad debts for each year. Thus, the excess profits net income, after this adjustment, did not reflect, either directly or indirectly, any recoveries of bad debts.

It is the position of the respondent that Congress, in providing this adjustment, in effect placed the petitioner and other banks employing the reserve method, on the "specific charge-off" method for the purpose of computing the excess profits net income, and that under such method income from recoveries of bad debts is includible, with the exception of the portion of such income specifically excluded by subparagraph (G), namely, the income attributable to the recovery of debts which gave rise to deductions for prior years as to which no excess profits tax was imposed. In so arguing the respondent refers to the regulations which have long provided that recoveries of bad debts must be included in computing gross income of taxpayers

---

[5] Sec. 40.433 (a)–1 of Regulations 130 provides in part:

The excess profits net income computed under section 433 (a) for any taxable year ending after June 30, 1950, is the normal-tax net income increased or decreased by the adjustments provided in section 433 (a) (1). * * *

(1) In the case of a bank (as defined in section 104) using the reserve method of accounting for bad debts, section 433 (a) (1) (L) requires an adjustment to normal-tax net income equal to the difference between (1) the amount of the deduction for additions to the reserve for bad debts allowed under section 23 (k) (including, in the case of the taxable year in which the reserve is established, the deduction for the initial credit to the reserve) and (2) the amount that would have been allowable as a deduction under section 23 (k) for bad debts for the taxable year if the bank did not use the reserve method of accounting for bad debts. The adjustment is effected by increasing normal-tax net income by the amount of the deduction allowed under section 23 (k) for the additions to the bad debt reserve for the taxable year and by decreasing normal-tax net income by the amount of the deduction which would be allowable under section 23 (k) for the debts which actually became worthless in the taxable year, in whole or in part.

employing the specific chargeoff method.[6] The respondent has therefore added to the excess profits net income reported by the petitioner income resulting from the recovery of debts which had been deducted or charged to the reserve in prior excess profits tax years.

We agree with the petitioner that the respondent erred in making this adjustment. In enacting section 433 (a), Congress has specifically, and in detail, provided for the method of computing excess profits net income. In subparagraph (L) it has specifically legislated with regard to the treatment of bad debts in the case of banks employing the reserve method. Neither in that subparagraph nor elsewhere in section 433 (a) did Congress provide for the inclusion by such banks of recoveries of bad debts. We must assume that Congress, in specifically legislating with regard to banks employing the reserve method, completely expressed its intention as to the effect of bad debts and recoveries in the computation of their excess profits net income. Considering the precise detail provided by Congress for the computation of excess profits net income, we think that had it intended to implement subparagraph (L) by restoring to excess profits net income of a bank on the reserve method any income from recoveries of bad debts, it would have so provided. The congressional committee reports regarding section 433 seem to indicate that subparagraph (L) spells out the extent of bad debt adjustments to be made in the case of banks on the reserve method in reaching the equitable result referred to in the Senate report; at least such reports do not indicate that any further adjustment is to be made.[7] Nor do

---

[6] Sections 29.23 (k)–1 of Regs. 111 and 39.23 (k)–1 (c) of Regs. 118 provide in part:
Any amount subsequently received on account of a bad debt or on account of a part of such debt previously allowed as a deduction for income tax purposes, must be included in gross income for the taxable year in which received, except to the extent excludible from gross income under the provisions of section 22 (b) (12). * * *

It is also recognized that the courts have consistently held that recoveries of amounts in respect of which deductions have been taken in prior years constitute income in the year of recovery. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359; *Putnam National Bank,* 20 B. T. A. 45, affd. (C. A. 5) 50 F. 2d 158; *Sneed* v. *Commissioner,* (C. A. 5) 119 F. 2d 767, 771, affirming 40 B. T. A. 1136; *Lake View Trust and Savings Bank,* 27 B. T. A. 290; *Freihofer Baking Co.* v. *Commissioner,* (C. A. 3) 151 F. 2d 383.

[7] S. Rept. No. 2679, 81st Cong., 2d Sess., p. 15 (1951–1 C. B. 250), states in part:
Bad debts reserves of banks.—Banks which have elected to use the reserve method of accounting for bad debts for income tax purposes substitute for excess profits tax purposes a deduction for debts which became worthless in whole or in part within the taxable year. This is desirable because the banks which elected to use the reserve method for income tax purposes beginning in 1947 have for the most part accumulated reserves that equal or approach the maximum allowable under the existing rulings. In view of this situation and because of the probability that losses from bad debts will be comparatively low during the excess profits tax years it is likely that the deductions under the reserve method will be abnormally low during the excess profits tax period. The deduction of such losses as they occur will provide a more equitable result.

The report of the Ways and Means Committee, H. Rept. No. 3142, 81st Cong., 2d Sess. (1951–1 C. B. 187, 196), states in part:
To permit an equitable comparison between the base period net income and the income of the excess profits tax year, the bill permits banks using the reserve method of accounting for bad debts to claim a deduction for the purpose of determining excess

the regulations promulgated under section 433 (a) of the Code provide for any further adjustment.

The respondent on brief has disclaimed reliance upon section 433 (a) (1) (G), and we think properly so. Subparagraph (G) provides for the *exclusion* of income attributable to the recovery of certain debts, but does not provide for any *inclusions*. Moreover, it is a provision of general application, whereas subparagraph (L) deals specifically with banks employing the reserve method. Accordingly, we see no implication in that subparagraph that Congress intended that banks on the reserve method should include in excess profits net income any income attributable to the recovery of bad debts.

We cannot accept the respondent's view that the income tax regulations, above-referred to, require the inclusion in the petitioner's excess profits net income of recoveries of bad debts. Such regulations relate to gross income for the purpose of computing the normal tax net income and surtax net income. As previously indicated, the petitioner's normal tax net income and surtax net income, for purposes of the imposition of the normal tax and the surtax, indirectly include income attributable to recoveries of bad debts, and this is not affected by section 433 (a). In computing the excess profits net income, we are bound by the specific provisions of section 433 (a) and in such computation only the adjustments provided therein may be made to the normal tax net income. Cf. *Gus Blass Co.*, 9 T. C. 15, appeal dismissed (C. A. 8) 168 F. 2d 833 and *Charleston National Bank*, 20 T. C 253 appeal dismissed (C. A. 4) 213 F. 2d 45, in which we held that in computing the excess profits net income under section 711 (a) of the Internal Revenue Code of 1939 only those adjustments specifically provided should be made to normal tax net income.

Upon this issue we hold for the petitioner.

### Club Membership.

In determining the deficiency for the year 1951 the respondent disallowed a claimed deduction in the amount of $670 which represented the cost of a membership in the Dallas Athletic Club including Federal excise tax in the amount of $110 and one month's dues in the amount of $10. The respondent now concedes error in his disallowance of the amount of the month's dues in view of the stipulation that since purchase of the membership it has been used by an officer of the petitioner in connection with the petitioner's business.

---

profits tax net income on the basis of debts which become worthless in whole or in part during the taxable year.

In connection with this latter quotation it may be noted that section 433 (b) (12) of the Code provides for the adjustment of base period net income in the same manner as the excess profits net income is adjusted under section 433 (a) (1) (L). This, however, has no direct bearing here since the petitioner did not compute its excess profits credit on the income method.

The petitioner contends that the entire amount remaining in dispute is deductible as an ordinary and necessary business expense, not only because that amount was required to be paid in order for it to have the privileges of the club but also because there was no assurance that any part of the cost would ever be repaid to it. The respondent's position is that both the amount of the initiation fee of $350, and the cost of the certificate of membership and beneficial interest, plus excise tax on both items, were capital expenditures.

The respondent is sustained on this point. The cost of membership in the club, embracing all the expenditures except the dues, was payable but once and the membership had a useful life beyond the year of acquisition. In fact, as far as the record shows, the membership and its benefits were of indefinite duration. The expenditure for membership here is much like that of the cost of the clearing house membership that was before us in *Grace National Bank of New York*, 15 T. C. 563, affirmed per curiam (C. A. 2) 189 F. 2d 966. As to the cost of such membership we said:

It is not a recurring expense, and its benefits are not limited to the taxable year in which it was paid or incurred but will last as long as petitioner elects to remain a member of the Association. It has utility long beyond the tax period involved. As such, it is a capital expenditure rather than an "ordinary" business expense incurred during the taxable year. * * *

### *Cost of Relocating Manager's Office.*

The petitioner, after conceding that $604.50 of the relocation expenses should be capitalized, claims a deduction of $12,001.62 which represents the unreimbursed costs of relocating its building manager's office. The respondent resists the deduction on the ground that the expenditures added to the value of the petitioner's rental properties in that the petitioner thereby obtained an improved office on the 28th floor of its building which had a useful life far in excess of 1 year.

We think that the respondent properly disallowed the claimed deduction. The items installed in the new office of the manager as set out in the Findings of Fact were, in the main, "permanent improvements" which, as was said in *Parkersburg Iron & Steel Co.* v. *Burnet*, (C. A. 4) 48 F. 2d 163, 166 affirming 17 B. T. A. 74, are:

alterations which, both by their very nature and use, are relatively permanent, although they may never in fact enhance the actual value of the property as an investment, as opposed to alterations of which both the nature and the use are relatively temporary. See Duffy v. Central R. Co., 268 U. S. 55, 45 S. Ct. 429, 69 L. Ed. 846. In Hubinger v. Commissioner (C. C. A.) 36 F. (2d) 724, 726, "ordinary expenses" under this statute were defined as "those due to wear and tear and trifling accidental causes."

In *Louisiana Land & Exploration Co.*, 7 T. C. 507, 515, affirmed on other issues (C. A. 5) 161 F. 2d 842, we pointed out that an

expenditure is of a capital nature where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period of business operation. There is no claim made by the petitioner in this case that the major items installed in the new office of the manager were of comparatively short life in the rental operation of the building, and it would appear from their description that they would have a comparatively lengthy period of use in the business.

Even if this expenditure be viewed as one required solely to retain the tenant, nevertheless the result would be the same since, so far as is shown, the benefit thereof would extend over a lengthy period.

We accordingly sustain the respondent on this issue.

### Lighting System.

In our view the respondent properly disallowed the deduction for the cost of replacing the lobby lighting system. This was something more than an ordinary repair which is made "for the purpose of keeping the property in an ordinarily efficient operating condition." *Illinois Merchants Trust Co., Executor*, 4 B. T. A. 103. The installation of an adequate lighting system on the ground floor of a commercial building is in the nature of an improvement made to increase the value of the building within the meaning of Code section 24 (a) (2), and the cost is not currently deductible.

*Decisions will be entered under Rule 50.*