VITO LOMBARDO and GILBERTE LOMBARDO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lombardo v. Commissioner
Docket No. 6561-77.
United States Tax Court
T.C. Memo 1979-11; 1979 Tax Ct. Memo LEXIS 512; 38 T.C.M. (CCH) 29; T.C.M. (RIA) 79011; January 8, 1979, Filed Gilberte Lombardo, pro se. Richard A. Jones, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1973 and 1974 in the amounts of $ 1,295.48 and $ 1,690.90 and additions to tax under section 6653(a), I.R.C. 1954, [1] in the amounts of $ 64.77 and $ 84.55, respectively. Respondent having made certain concessions, the issues for decision are (1) whether, and if so the extent to which, Gilberte Lombardo understated her income from tips in each of *513 the years here in issue; (2) whether the amount of $ 1,498.90 claimed by petitioners in 1974 as a deduction for repairs and maintenance of rental property constituted an ordinary and necessary business expense or was a capital expenditure; and (3) whether respondent properly determined an addition to tax in each year for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, who resided in Las Vegas, Nevada at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1973 and 1974. Gilberte Lombardo (hereinafter referred to as petitioner) was hired as a waitress at the Casino de Paris Showroom (Showroom) of the Dunes Hotel and Country Club (Dunes) on October 1, 1972. She was still employed as a Showroom waitress at the Dunes at the time of the trial of this case. During the years 1973 and 1974, petitioner's paid hours worked at the Showroom totaled 1,323 and 1,165, respectively. Petitioner was on a leave *514 of absence from June 6, 1974 until August 13, 1974. During the years 1973 and 1974 petitioner, in her work as a waitress in the Dunes Showroom, received tip income in cash and also received tip income through the payroll department of the Dunes. The tips she received through the payroll department of the Dunes were included in her checks and also included in her wages as reported by the Dunes on the Form W-2 provided to petitioner for each of the years here in issue. Petitioner reported cash tips she received to the Dunes for the year 1973 of $ 628.18 and this amount was also included in the wages received by petitioner on the Form W-2 furnished to her by the Dunes for 1973. Petitioner did not report any amount of cash tips received to the Dunes in the year 1974. The Dunes Showroom is a large room in which a floor show is presented twice nightly. One of the shows is a dinner show and at the second show drinks only are served. Some customers of the Showroom purchased prepaid tickets or came to the Showroom with a tour group. When tour groups were served, the tour group leader either purchased prepaid tickets for all members of the tour group, arranged with the Dunes to be *515 billed for the members of the group or paid the cashier of the Showroom the evening the group came. In all instances of prepaid customers or tour group customers, regardless of the method of payment, the price of the ticket or the total price for the tour group included an amount representing a tip for the waiters or waitresses serving the ticket purchasers or the tour group. For this reason we will refer to the individual ticket purchaser patron, as well as the tour group patrons, as the ticket patrons of the Showroom. The price of the food and drinks for ticket customers was below the lowest minimum entree price of dinner for the dinner show and the drink minimum for the second show. However, under the union contract which the Dunes had with the waiters and waitresses (hereinafter collectively referred to as waitresses) for the years here in issue the portion of the ticket price allocated to tips on sales to ticket patrons could not be less than 15 percent of the lowest menu entree price for the dinner show or the minimum drink charges for the second show in effect at the time the tickets were used. As a result of this union requirement, the tips allocated on the dinner show *516 in each of the years here in issue were $ 1.69 per ticket, and on the second show the tips were $ 1.28 and $ 1.35, respectively, for the years 1973 and 1974. For this reason the guaranteed tip to the waitress for the dinner show amounted to approximately 25 percent of the average amount included by the Dunes as ticket food sales in the year 1973 and 23 percent in 1974. For the late show, the guaranteed tip amounted to 28 percent of the average per person amount of ticket sales included by the Dunes in its beverage revenue for the year 1973 and 30 percent in the year 1974. In 1973 and 1974, at least half of the Dunes Showroom customers were ticket purchasers. However, because of the ticket purchasers paying less for dinner and drinks than other patrons, the percentage of Showroom revenue from the ticket patrons would not be the same percentage of sales as the percentage of ticket patrons to total patrons. Some customers of the Showroom who were not ticket patrons paid their bills in cash and others paid by a credit charge card or by a charge on their bills for their rooms. In each of the years here in issue a number of the Dunes Showroom patrons were complimentary guests of *517 the hotel. The majority of the complimentary guests were persons staying at the Dunes free of charge in order to encourage them to gamble at the Dunes. These persons were generally referred to as "junket comps." Some of the complimentary patrons were persons who had done extensive gambling in the Dunes hotel, resulting in substantial losses, and who had been offered a complimentary dinner and drinks at the Showroom by the Dunes management. The complimentary patrons received favored treatment at the Showroom in terms of where they were seated and the service furnished to them. Although no charge was made to the complimentary patrons for food and drinks, the food and drink served to them were shown in the total sales of the Showroom on the books and records of the Dunes. The total amounts for sales to complimentary patrons included in the Dunes sales records were $ 1,207,656.52 for 1973 and $ 611,190.68 for 1974. The customer seating area at the Dunes is divided into a number of waitress stations for each show. For the dinner show waitresses worked in teams of two at each station, and the two waitresses shared their tips equally. There is only one waitress assigned to each *518 station at the second show and therefore there is no tip-splitting for that show. One member of each team that worked the dinner show would work the second show so that each waitress worked the second show every other night of the days she worked. During the years 1973 and 1974 the number of Showroom stations for the dinner show and second show ranged up to 18 or 20, with the number of seats in each station not less than 36. Some stations were preferable to others and therefore the Showroom stations were rotated among the waitresses on a daily basis. During the year 1973 the Showroom operated the dinner show 365 days and the second show 364 days. The total attendance at the Showroom during 1973 was 409,990, of which 188,796 attended the dinner show and 221,194 attended the second show. During 1974 each show was operated 361 days. The total attendance at the Showroom in 1974 was 398,020, of which 181,196 attended the dinner show and 216,824 attended the second show. The posted fire capacity for the Showroom for the years 1973 and 1974 was 542 persons for the dinner show and 650 for the second show. On some occasions, however, the actual seating in the Showroom exceeded the *519 standard limits. Each waitress at the Dunes Showroom in 1973 and 1974 performed approximately the same percentage of paid setup and cleanup time to actual serving time. During the year 1973 and from January 1, 1974 until August 1974, the tips from sales to ticket patrons who had either paid in advance or for whom the tour group leader paid the cashier the night the tour group came to the Showroom were paid to the waitresses serving the ticket patrons in cash at the end of the waitresses' working period in the Showroom. When ticket patrons were part of tour groups in instances where the group leader was billed later by the Dunes hotel, no amount of the tip was paid to the waitress in cash on the day she served the group. The tips on these sales were accounted for through the Dunes payroll department and each waitress's portion of the tips on such sales was paid to her as part of her regular payroll check. Beginning in August 1974 all tips on sales to ticket patrons were accounted for through the payroll department with no amount of cash tip paid to the waitress the evening she served the ticket patrons. The amount of a waitress's proportionate share of the tip which was paid *520 through the payroll department was included as part of her regular payroll check. During 1973 and until August 1974 the tips on approximately one-half of the sales to ticket patrons were paid in cash to the waitresses and were not included in the amounts reflected on the Dunes payroll records and therefore were not included as "wages, tips and other compensation" on the Forms W-2 provided the waitresses by the Dunes at the end of each of the years 1973 and 1974. The tips on sales to ticket patrons of the Show-room which were reflected on the records of the Dunes payroll department and included on the Forms W-2 provided to the Showroom waitresses totaled $ 148,257.90 and $ 211,121.96 for the years 1973 and 1974, respectively. The total paid hours worked by all waitresses at the Showroom during the years 1973 and 1974 totaled 72,910.5 and 68,557, respectively. Waitresses who served individual ticket patrons and small groups of ticket patrons received either in cash or through their pay checks the entire amount of the tip applicable to the patrons served. However, where service was to large tour groups of over 25 ticket patrons, or the total amount of dollar receipts from a group *521 of ticket patrons was as large as that for such large groups, the Showroom captain received a portion of the tip applicable to the patrons so served. In cases of large groups, the waitresses received from 73 to 86 percent of the guaranteed tip. For 1973 and 1974 the guaranteed tips which petitioner received through her payroll checks from the Dunes Showroom were $ 2,588.43 and $ 4,391.40, respectively. All other tips received by petitioner in each of these years were received in cash. In some instances a cash customer would leave no tip for petitioner. Also, in some instances, a complimentary customer would leave no tip for petitioner. During 1973 and 1974 petitioner kept a record of some of her tips. However, these records were in a brief case which was stolen from petitioner on October 1, 1977. The following schedule shows the amounts entered in the records of the Dunes as Showroom sales, cabaret tax, sales tax and total: 1973
1974
Showroom Sales
(excluding taxes)
$ 4,014,262.54
$ 3,918,981.55
Cabaret Tax
359,346.86
323,208.87
Sales Tax
125,279.96
112,417.49
Total
$ 4,498,889.36
$ 4,354,607.91
Respondent's agent, in investigating *522 the records of the Dunes and the waiters and waitresses who worked there, reviewed the sales charged by individual patrons to their rooms at the Dunes for 52 different days scattered throughout the year 1973. Each of these charge sales used by respondent's agent, which he referred to as "front office charges," showed some amount of tip listed on the charge. The total front office charges, including tax for the 52 days reviewed by respondent's agent, in 1973 was $ 78,501.48. During the year 1974, respondent's agent reviewed 7 days of front office charges scattered throughout the year. The total of such charges, including tax for the 7 days, was $ 8,140.29. Respondent's agent separately added up the tips shown on the front office charges for the 52 days in 1973 and the 7 days in 1974 and computed a percentage of tips to total sales in 1973 of 15.8 percent and in 1974 of 16.1 percent. These percentages were on the basis of the total charges including tax. To determine total tip income of all waitresses in the Showroom respondent's agent subtracted from total gross sales, including taxes, of the Showroom in each of the years 1973 and 1974, 25 percent of the total amount to compensate *523 for persons who left no tip, the fact that cash customers may tip less than charge customers and the fact that waitresses vary in skill. The remaining 75 percent of the gross sales of the Showroom in each year was multiplied by 15.8 percent to obtain the total tips received by all waitresses in the year. [2] The amount arrived at by multiplying 75 percent of total sales of the Showroom in each year by 15.8 percent was reduced by 16.67 percent to allow for tips distributed by waitresses to busboys and bartenders. From the amount of such reduced tips, the amount of contract tips paid to the captains was subtracted to arrive at total tip income computed to be retained by all waitresses. This total tip income computed to be retained by waitresses was divided by the total paid hours worked by waitresses to arrive at an amount of cash tips per hour worked by waitresses. The hourly amount computed on this basis was $ 6.67 in 1973 and $ 7.41 in 1974. [3]
*524 Respondent's agent computed the total amount of tips received by petitioner in each of the years 1973 and 1974 by multiplying the total hours she worked in each year by the computed average tip per hour received by all waitresses in that year. From about 1963 throughout the year here in issue petitioners owned rental property in Las Vegas. One building they owned was divided into two apartments. In the latter part of 1973 or the early part of 1974, the tenants moved from one of the apartments in this building and petitioners decided to modernize the apartment. Petitioners had the walls of the apartment torn out and put new electrical wiring and fixtures into the walls. They installed new plumbing in the apartment and put in new flooring, new walls and new cabinets. In 1974 petitioners spent $ 1,498.90 for this work done on the rental property. Petitioners, on their Federal income tax return for 1974, deducted the $ 1,498.90 as a repair expense. Petitioners, on their joint Federal income tax return for 1973, included as tips received by petitioner $ 3,216.61, composed of $ 2,588.43 of tips included in payroll checks and $ 628.18 of cash tips reported to employer. [4] For *525 the year 1974, petitioners reported on their joint Federal income tax return as tips received by petitioner the amount of $ 5,191.40, composed of $ 4,391.40 of tips included in payroll checks and $ 800 of cash tips. Respondent in his notice of deficiency determined that petitioner received total tip income of $ 8,824.41 and $ 8,828.78 for the taxable years 1973 and 1974, respectively, and on this basis determined that petitioner had understated tip income by $ 5,608.41 in 1973 and $ 3,636.38 [5] in 1974. Respondent disallowed the claimed deduction of $ 1,498.90 for repairs to rental property in 1974. This, along with *526 other claimed rental deductions now conceded by respondent, was disallowed with the explanation that information needed to support the claimed deduction had not been furnished. At the trial respondent took the position that the $ 1,498.90 was a capital expenditure. OPINION Petitioners first contend that tips which were not included in petitioner's payroll checks are gifts and not compensation. On numerous occasions we have held that tips do constitute compensation for services rendered and are includable in a taxpayer's gross income under section 61(a). Schroeder v. Commissioner,40 T.C. 30, 33 (1963), and cases there cited. Petitioners next contend that if tips received in cash are considered income, it is up to respondent to prove the amount of tip income received by petitioner. Petitioners argue that the formula used by respondent based on averages is not proof of the amount of tip income petitioner received. This contention by petitioners is likewise erroneous. The *527 record here shows that the records with respect to tip income kept by petitioner were never shown to any agent or representative of respondent and at the time of trial had been stolen. More important, if the tip income reported by petitioner came from these records, the records could not have been accurate. The record shows that in 1973 petitioner received approximately $ 5,176 of tip income from ticket patrons and some tips from other customers, but only reported total tip income of $ 3,216.61. In 1974, the record shows that petitioner received total tip income from ticket patrons of approximately $ 6,197, but only reported on her income tax return total tip income of $ 5,191.40. [6] The record in this case shows, and petitioner in fact admits that it shows, that only about half of the tips she received from ticket patrons were included in her payroll checks in 1973 and for the period January 1, 1974 until August 1974. Therefore, clearly cash tips received from ticket patrons by petitioner in each of the years here in issue were greatly in excess of the tips other than those received through payroll checks reported by petitioner. Petitioner admits that in addition she received *528 cash tips from customers who paid by cash, by charging their purchases to a credit card or by charging to their rooms at the Dunes and from complimentary customers. Where a taxpayer fails to keep adequate records to clearly reflect income, respondent is authorized under the provisions of section 446 to compute the taxpayer's taxable income under such method as in his opinion does clearly reflect income. *529 Where a taxpayer has kept inadequate records of tip income, use of a method for computing such taxpayer's tip income similar to that used by respondent in this case has been approved by this and other courts. See Mendelson v. Commissioner,305 F.2d 519 (7th Cir. 1962), affirming a Memorandum Opinion of this Court. Finally, petitioner contends that regardless of the accuracy of respondent's computation with respect to receipts by waitresses on the average, the amount so computed for her tips is inaccurate. It is difficult to follow petitioner's complaint in this respect. She considered herself a good waitress and testified that she gave good service and courteous service to her customers. It would appear from this testimony that the tips received by petitioner might have been above average rather than below average. [7]
*530 In our view, respondent's computation of total tip income received by petitioner for the year 1973 is most reasonable except that $ 5.82 per hour, rather than $ 6.67, should have been used. Respondent's computation of petitioner's total tip income, as corrected, for 1973 is $ 7,699.86. The record shows that petitioner received approximately $ 5,176 from ticket patrons in 1973. See Footnote 6, supra. Under respondent's computation as corrected, this would leave only $ 2,523.86 as received in cash tips. Petitioner testified that she estimated that 60 percent of the customers she served in 1973 and 75 percent in 1975 were ticket patrons. We have made no such finding, since from the record as a whole we do not believe this estimate is accurate. If it were accurate, petitioner's ticket patron tips would have been much higher. The record shows that the total amount paid through payroll checks to all waitresses from ticket patrons in 1973 as tips was $ 148,257 and that the total hours worked by all waitresses in 1973 was 72,910.5, which shows that on the average a waitress received $ 2.03 per hour as ticket patron tips. Petitioner worked 1,323 hours in 1973. Therefore, if petitioner *531 served the average number of ticket patrons in 1973 her receipts of tips from ticket patrons through her payroll checks would have been $ 2,686, which is more than the $ 2,588 she did receive through her payroll checks from ticket patron tips in 1973. We would therefore conclude that not over 50 percent of the customers petitioner served in 1973 were ticket patrons. In 1974 the per hour amount received by all waitresses from ticket patrons through their payroll checks was $ 3.08 ($ 211,121 divided by 68,557). Petitioner worked 1,165 hours in 1974. So, if she received the average amount of tips in that year through the payroll from ticket patrons, her total receipts from this source would have been $ 3,588 as compared to $ 4,391 which she actually received. It would appear from this that petitioner did perhaps serve more than 50 percent ticket patrons in 1974. The amount respondent determined that petitioner received as total tips in 1973 is over $ 1,500 less than the amount she received from ticket patrons, even though half or over half of her customers in 1973 were not ticket patrons. On the basis of this record as a whole, we consider respondent's computation of petitioner's *532 total tip income for 1973, as corrected, to be very fair and sustain that computation. Respondent's computation for 1974 is essentially the same as for 1973 except that he used percentage of tips to sales from front office charges for 1973 to apply to 1974. Respondent recognized that the 7 days used as a sample of front office charges in 1974 was an inadequate sample. Since the 7-day period came out to 16.1 percent tips to sales as compared to a ratio of 15.8 percent for 1973, respondent argues that his use of the 1973 percentage is favorable to petitioner. Respondent's method of computation for 1974 of petitioner's tip income does not appear unreasonable, and if no better evidence appeared in the record we would be inclined to accept respondent's computation for 1974 as corrected. However, we do not conclude, as does respondent, that because the computation for 7 days showed a 16.1 percent tip ratio an adequate sample would have shown this amount or the 15.8 percent ratio derived in 1973. Prices were slightly higher in 1974 for certain items as shown by the increase in the tip on the minimum charge for the second show for sales to ticket patrons where a tip of 15 percent of *533 the minimum was required. Also, the record indicates that the average price paid by ticket patrons for the dinner show was somewhat higher in 1974 than in 1973, but apparently the lowest entree menu price in effect for the dinner show was the same in 1973 and 1974 since the tip for that show for ticket patrons remained the same. The tips received by waitresses for the dinner show from ticket patrons averaged 25 percent of such sales in 1973 and 23 percent in 1974. Total attendance and total sales were somewhat less in 1974 than in 1973. With respect to tips, this reduced attendance was compensated for by the fact that total hours worked by all waitresses decreased from 72,910.5 in 1973 to 68,557 in 1974. The record shows that the dinner show operated 365 days in 1973 and the second show 364 days, whereas each of these shows only operated 361 days in 1974. Dividing the 72,910.5 hours worked by all waitresses in 1973 by 365 days results in approximately 200 hours of work by all waitresses each day of operation of the Showroom in 1973. Therefore, over 700 of the fewer hours worked by all waitresses in 1974 would be accounted for by the fewer days of operation. Considering *534 this record as a whole, the overall indication is that a waitress in 1974 would receive approximately the same tips per hour as she received in 1973 or perhaps slightly higher tips per hour in 1974 on ticket patrons. Therefore, in our view the most reasonable way on this record to compute petitioner's tips for 1974 is to multiply the hourly rate of tips she was computed to have received in 1973 of $ 5.82 by the 1,165 hours she worked in 1974. The result of such a computation is total tips received in 1974 of $ 6,780.30. When the total tips reported by petitioner in 1974 of $ 5,191.40 is subtracted from this figure, her resultant understatement of tip income for 1974 is $ 1,588.90. We therefore hold that petitioner understated her tip income for 1973 in the amount of $ 4,483.25 as determined by respondent's computation as corrected, and understated her tip income in 1974 by the amount of $ 1,588.90. The record shows that the $ 1,498.90 which petitioners claimed to be a deductible rental expense was paid to completely renovate an apartment in a rental property. On the basis of the facts in this record, we conclude that this expenditure was a capital expenditure which must be *535 added to the basis of the rental property and recovered through depreciation. The record shows that the expenditure was for a permanent improvement which enhanced the value of the property. Such items are capital expenditures and not deductible in the current year. See Mercantile National Bank at Dallas v. Commissioner,30 T.C. 84, 95-96 (1958). We therefore sustain respondent's disallowance of petitioners' claimed deduction of $ 1,498.90 as an ordinary and necessary business expense of their rental property. The final issue is whether respondent properly determined that petitioner was liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. The record here shows that whatever records petitioner may have kept of her tip income could not have been accurate if the amount of tip income reported by petitioner on her returns for the years here in issue came from those records. Failure to keep accurate records of income is negligent and violates respondent's rules and regulations. Petitioner has made no showing of error in respondent's determination of the addition to tax and in fact the record as a whole *536 shows negligence on petitioner's part for failure to keep accurate records of her tip income. We therefore sustain respondent's determination of an addition to tax in each of the years 1973 and 1974 under section 6653(a). Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Respondent's agent testified that the higher tip percentage computed on the basis of 7 days in 1974 was not used since he did not consider the 7 days to be a representative sample. ↩
3. The figures of $ 6.67 for 1973 and $ 7.41 for 1974 are those used by respondent in his notice of deficiency and which the agent testified were the result of the computation as outlined in the opinion.Using the figures and computation as testified to by respondent's agent, we arrive at an amount of $ 5.82 for 1973 and $ 5.95 for 1974, computed as follows: 1973
$ 4,498,889.36 (1,124,722.30)
[25% X $ 4,498,889.36]
3,374,167.06 X 15.8% 533,118.38 ( 88,870.83)
[16.67% X $ 533,118.38]
44,247.55 ( 20,000.00)
424,247.55 ./. 72,910.5 hours $ 5.8187442 =
$ 5.82 per hour
1974
$ 4,354,607.91 (1,088,651.90)
[25% X $ 4,354,607.97]
3,265,956.01 X 15.8%
516,021.04 ( 86,020.70)
[16.67% X $ 516,021.04]
430,000.34 ( 22,000.00)
408,000.34 ./. 68,557 hours $ 5.9512572 =
$ 5.95 per hour
Therefore, the total amount of tips received by petitioner mathematically properly computed under the formula worked out by the revenue agent and used as the basis of the notice of deficiency should have been $ 7,699.86 for 1973 and $ 6,931.75 for 1974.↩
4. In the notice of deficiency respondent determined that total tips reported by petitioner in 1973 was $ 3,216.61. On their joint return petitioners reported, in addition to this amount, tips of $ 610. Mr. Lombardo listed as his occupation in each of the years here in issue that he worked at the service bar of the Dunes and the returns show he received tips. Therefore, apparently the $ 610 in 1973 was his tips. In any event, petitioners have not contested the amount of tip income determined by respondent in the notice of deficiency as reported by petitioner.↩
5. This figure is in error by $ 1 since respondent in the notice of deficiency used $ 5,192.40 as reported tip income and the record shows the reported tip income to be $ 5,191.40.↩
6. The 1973 total tip income from ticket patrons is computed by doubling the amount of ticket patron tips paid to petitioner through payroll checks to account for cash tips from ticket patrons in accordance with the clear evidence in the record that at least half of the ticket patron tips was paid to waitresses in cash in 1973 and until August 1974. The amount for 1974 paid to petitioner in cash from ticket patrons is estimated by dividing the amount paid to her in payroll checks by 17 (7 months of 1/2 of total plus 5 months of total ticket patron tips estimated as 17 months of 1/2 of such tips) and multiplying the resultant figure by 7 to determine cash tips from ticket patrons for 1974 to be added to the amount of such tips in 1974 paid to petitioner in her payroll checks.↩
7. Petitioner also argues that since most of the waitresses of the Dunes Showroom settled their cases with respondent for less than the amount computed under the formula used by respondent, a lesser amount should be used in her case. The record does not show whether other waitresses settled their cases with respondent or the basis of such settlements. Petitioner's argument in this respect at the hearing is not evidence. However, even if the record did show settlements made between respondent and other waitresses, this fact would be totally immaterial to the determination in petitioner's case. All this would show would be that, for undisclosed reasons, waitresses and respondent agreed to the amount of the tax liability of those waitresses, which would have no relevance to petitioner's case.↩