Basil L. KAUFMANN and Shirley K.
Kaufmann, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 1143.

United States District Court
W. D. Missouri,
St. Joseph Division.

Aug. 5, 1963.

Basil L. Kaufmann, St. Joseph, Mo.,
for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen.,
Edward S. Smith, Jerome Fink, Robert
W. Ryan, Jr., Attys., Dept. of Justice,
Washington, D. C., John L. Kapnistos,
Asst. U. S. Atty., Kansas City, Mo., for
defendant.

DUNCAN, District Judge.

Plaintiffs, taxpayers, instituted this action against the defendant to recover the sum of $3,026.67 and $516.59 interest, together with interest at 6% on the combined amounts from the date of payment. The sum is alleged to have been improperly collected by the Internal Revenue Service on income of the plaintiffs for the taxable year ending December 31, 1957.

The cause is before the court on an Agreed Statement of Facts.[1] (Caption omitted)

I.      "STIPULATION
"AGREED STATEMENT OF FACTS

"Now, on this day, come the parties to the above entitled cause and agree to submit the above cause to the Court, for its determination thereof, and agree that the following are the facts upon which the same is to be decided:

"Plaintiffs seek to recover of the Defendant the sum of Three Thousand, Twenty-six Dollars and Sixty-seven Cents ($3,026.67) (a tax paid), together with the sum of Five Hundred Sixteen Dollars and Fifty-nine Cents ($516.59) (interest paid thereon), together with interest upon the total sum at the rate of six per cent (6%) per annum from April 3, 1961 to the date of payment. Plaintiffs claim that these amounts were erroneously collected by the Defendant and that they are entitled to a judgment for a recovery of said sums, together with interest thereon, as allowed by law. Defendant denies that the collection of said tax and interest was erroneous and maintains that Plaintiffs are not entitled to a judgment in any sum.

"The following are the facts upon which said controversy depends, to-wit:

"1. Plaintiffs were, and are at all times herein mentioned, residents of St. Joseph, Buchanan County, Missouri;

"2. This action arises under the Internal Revenue Code of 1954, as amended, Title 26, U.S.Code, and this Court has jurisdiction thereof under Title 28, Section 1340 of the U.S.Code;

"3. Plaintiffs on or before April 15, 1958 timely filed their Federal Income Tax Returns for the taxable year ending December 31, 1957, with the Collector of Internal Revenue for the Western District of Missouri, and paid the amount of tax shown to be due according to the Returns so filed;

"4. The District Director of Internal Revenue at Kansas City, Missouri, mailed to the Plaintiffs notice of Federal Income Tax due for the taxable year ending December, 1957, in the amount of Three Thousand, Twenty-Six Dollars and Sixty-Seven Cents ($3,026.67). The alleged deficiency resulted from the disallowance by the Commissioner of Internal Revenue of a deduction from gross income taken by the Plaintiffs in computing their net income in said Return for the taxable year ending December 31, 1957, to-wit: Four Thousand, Three Hundred One Dollars and Forty-one Cents ($4,-301.41) as professional fees and expenses which had been deducted as an ordinary and necessary business expense under Section 212 of the Internal Revenue Code and Section 1.212–1 of the Regulations promulgated thereunder; and as shown on Plaintiffs' 1957 Return as accounting under the general heading Miscellaneous. A copy of Plaintiffs' 1957 Federal Income Tax Return is attached as Exhibit A.

"5. That the relevant facts with respect to said deduction for ordinary and necessary business expenses are as follows:

"a. Commerce Loan Company, a Missouri corporation, hereinafter referred to as 'Commerce', was incorporated on October 5, 1925, by Basil L. Kaufmann, Gerald D. Feltenstein, and David D. Feltenstein (deceased), with an original capital of Six Thousand Dollars ($6,000.-00), consisting of sixty (60) shares. The company was engaged in the small loan or consumers' finance business, and operated, in its own name and through fifteen wholly-owned subsidiaries, forty-one loan offices located in various cities in the States of Arizona, Colorado, Florida, Illinois, Kansas, Kentucky, Louisiana, Minnesota, Missouri, Nebraska and Nevada. The principal office of Commerce was located at 701 Edmond Street, St. Joseph, Missouri. As a result of increases, the authorized and issued capital stock of Commerce as of July 31, 1957 consisted of One Million Six Hundred Ninety-six Thousand, Five-Hundred Dollars ($1,-696,500.00), of which Four Hundred Forty-Six Thousand Dollars ($446,000.00) was common and the balance various classes of preferred.

"b. Neither the preferred issues nor the common stock of Commerce was listed on any exchange or traded in the over-the-counter market. Basil L. Kaufmann, Edward D. Feltenstein and Gerald D. Feltenstein (brother of Edward D. Feltenstein), and members of their immediate families, owned all of the common stock of Commerce.

"c. The executive management of Commerce and its subsidiaries was in the hands of Basil L. Kaufmann, Chairman of the Board and Director; Edward D. Feltenstein, President and Director; and Gerald D. Feltenstein, Executive Vice-President and Director. The other two Directors of Commerce were officer-employees who, with other officers of the company and its subsidiaries, were concerned with the routine operation of the business and did not exercise policy-making functions.

"d. American Investment Company of Illinois, hereinafter referred to as 'American', was organized under the laws of Delaware on August 21, 1925, and maintains its executive office at 8251 Maryland, St. Louis, Missouri. American conducts its business through a number of subsidiaries. Its principal business is the making of personal installment loans primarily under the provisions of various state small loan laws. On December 31, 1956 American's subsidiaries operated 409 loan offices in 317 cities, in 31 states. On April 10, 1957 there were 4,574,723 shares of common stock outstanding, and some additional shares have been issued since that date. The prior preferred and the common stock are listed on the New York Stock Exchange and the common stock is also listed on the Midwest Stock Exchange. There is limited but regular trading in the common stock.

"e. The executive officers of American have had many years of experience in the operation and financing of a large personal loan and consumer finance business. The membership of the Board of Directors and Advisory Board of American included, in addition to its executive officers, representatives of several invest-

ment, banking and brokerage firms, the Vice-Chairman of a commercial bank, and executives of several industries. The availability of the business and financial experience and counsel of this group of Directors constituted a business asset of American and contributed to its credit standing and its ability to secure the loan capital requisite for present needs and for the future requirements of an expanding and growing operation.

"f. Basil L. Kaufmann, who is an attorney and was Chairman of the Board of Commerce, was sixty years of age in 1957. Edward D. Feltenstein, President, was at such date 51 years of age, while his brother, Gerald D. Feltenstein, Executive Vice-President, was at such date 55 years of age.

The three officers had been active in the business since its organization in 1925, having been in sole and complete charge of its executive management, and directed and initiated its policies. They were primarily responsible for its growth and success. As of June, 1957, there was no one in the organization who was experienced enough to take over the executive direction and management of Commerce, or who enjoyed the prestige and recognition essential for assuring Commerce of the bank lines and long-term financing required to carry on a profitable operation.

"g. In light of these conditions the principal stockholders and executives of Commerce reached the conclusion that for the protection of their estates, in the event of their disability or demise, and to relieve themselves of responsibilities which they had carried on for many years, it would be in their personal interest and for the benefit of their associates and employees to combine Commerce with a larger nation-wide organization whose relative position in the personal and consumer finance field, facilities and credit standing would assure the management and financial resources required for the continuation of the business of Commerce in the event of their inability to direct and manage the operation at some future time. Such principal stockholders were also interested in leaving their estates with an investment, for which there would be a ready market, so as to avoid the risk of possible sacrifice of their stockholdings in Commerce, or an undue strain upon the financial resources of the business to provide funds for the payment of estate and inheritance taxes.

"h. As a result of these conclusions, negotiations were initiated and conducted with American commencing in June, 1957, whose outstanding management and position in the personal loan and consumers' finance field were deemed to meet the aforementioned requirements. These negotiations culminated in an agreement under which all of the common and preferred stock held by the common stockholders of Commerce would be exchanged for common and preference stock of American.

"i. During such negotiations American consistently maintained the position that 172,500 shares of common stock would constitute the maximum number of common shares which it would be willing to issue in the exchange, and unless the stockholders of Commerce would be willing to accept preference stock (voting) as part of the exchange for the common stock of Commerce the plan would not be acceptable. For the same reason, American was unwilling to issue shares of its common stock for the preferred stock of Commerce held by its stockholders, or to make the preference stock convertible into common shares. American also insisted on a provision giving it the privilege, at its option, to call the preference stock for redemption at the expiration of five years from the closing date, while the stockholders of Commerce insisted on a premium to be payable upon such call in order to make an early redemption less attractive to American.

"j. The purpose of American in acquiring the stock of Commerce was to expand the scope of its operation by acquiring offices in some communities, in which it or its subsidiaries were not then operating, and to acquire its well-established organization and clientele.

"k. When the negotiations were first initiated with American, Messrs. Basil L. Kaufmann and Edward D. Feltenstein employed the firm of Peat, Marwick, Mitchell & Co. to consult with them concerning the tax consequences (and for no other purpose) of various alternative plans for exchanging their holdings in Commerce for stock in American. Conferences were held with Mr. Kaufmann concerning the tax considerations associated therewith. Each plan submitted by either American or Commerce contained tax problems and research was performed by Peat, Marwick, Mitchell & Co. pertaining to the tax consequences thereof and there were consultations with Kaufmann and Feltenstein pertaining thereto before a plan was adopted that was satisfactory taxwise to the stockholders of Commerce.

"l. The taxpayers were advised that the problem associated with the plan of

reorganization should be resolved to their satisfaction, preparatory to the plan becoming effective, as the amount of tax liability which would be incurred in the event the exchange would not qualify as tax free would cause a rather substantial shrinkage in the assets of each stockholder. The taxpayers concurred in the view of their tax advisers, and contacted American who concurred with the idea of obtaining an advance ruling. As a result of the concurrence of both parties, a provision was made in the Agreement that the plan of reorganization would not become effective until—

'An advance ruling has been obtained from the Commissioner of Internal Revenue (i) that the exchange of the common stock and preferred stock of Commerce for common and preference stock of American constitutes a tax free exchange, (ii) that the disposition or redemption of the preference stock will not be subject to the provisions of Section 306(a) of the Code and (iii) that the deposit in escrow of 8,-000 shares of preference stock for the purpose of indemnifying American under the conditions described in item 6 hereof or the surrender of any portion of such shares pursuant to such escrow and/or of additional shares, not deposited in escrow, shall not be deemed a disposition or redemption within the meaning of Section 306(a) of the Code.'

The quoted text is set forth in the Agreement dated the 5th day of August, 1957 between the various stockholders of Commerce and American in paragraph 3, Part V. Said Agreement is attached and marked Exhibit B.

"m. The responsibility for drafting the Agreement was delegated to counsel for American, and the responsibility for reviewing same for the stockholders of Commerce was accepted by Basil L. Kaufmann. Peat, Marwick, Mitchell & Co. had nothing to do with the preparation or execution of the Agreement. After the text of the Agreement had been executed, Peat, Marwick, Mitchell & Co. were directed to prepare the necessary application for ruling to be filed with the Commissioner of Internal Revenue. The application for ruling, dated August 6, 1957, was filed on August 8, 1957 with the Reorganization and Dividend Branch of the Tax Ruling Division of the office of the Commissioner of Internal Revenue. Conferences were held with representatives of the ruling section in connection with the application. On October 4, 1957 the ruling was issued advising that the consummation of the plan to exchange the stock of the two companies would be regarded as a tax free exchange.

"n. After the consummation of the plan of reorganization, Peat, Marwick, Mitchell and Co. were employed by the taxpayers to prepare detailed schedules showing the tax basis of the American common and preferred stock that have been received by each of the taxpayers in exchange for the common and preferred stock of Commerce. The taxpayers required this information in connection with the future disposition of the stock they had received from American.

"o. On or about November 1, 1957 there was transmitted to Basil L. Kaufmann and Edward D. Feltenstein, by Peat, Marwick, Mitchell and Co., a bill for professional services rendered in the aggregate amount of Eight Thousand, Six Hundred and Two dollars and Eighty-one Cents ($8,602.81). Seven Thousand Dollars ($7,000.00) of this bill was for services rendered prior to October 4, 1951 (the date the Ruling was handed down by the Commissioner of Internal Revenue); One Thousand Dollars ($1,000.00) for services rendered, subsequent to said date, for preparing the detailed schedules referred to above (a copy of which is hereto attached and made a part of this Stipulation); and Six Hundred and Two Dollars and Eighty-one Cents ($602.81) to cover out-of-pocket expense incurred by the auditors in connection with the rendering of the services for which they were employed.

"p. On November 4, 1957 separate remittances, in the amount of Four Thousand, Three Hundred and One Dollars and Forty-Cents ($4,301.40) and Four Thousand, Three Hundred and One Dollars and Forty-one Cents ($4,301.41) were received by Peat, Marwick, Mitchell and Co. from Basil L. Kaufmann (one of the Plaintiffs herein) and Edward D. Feltenstein, respectively, in payment for the statement rendered. The amount paid by the taxpayers was for the professional services rendered and expenses incurred by the firm of Peat, Marwick, Mitchell and Co., and was deducted in the Joint Income Tax Return, filed on or before April 15, 1958, with the Collector of Internal Revenue from the Western District of Missouri, for the taxable year ending December 31, 1957, as an ordinary and necessary business expense. The Commissioner of Internal Revenue disallowed the entire amount on the ground the expenditure made must be capitalized as additional cost of the new

Briefly summarized, the facts are that one of the plaintiffs, Basil L. Kaufmann, Gerald D. Feltenstein and David D. Feltenstein (now deceased), organized the Commerce Loan Company, on October 5, 1925, with an original capital of $6,000.00 consisting of 60 shares.

The company was engaged in the small loan or consumers' finance business and operated in its own name and through fifteen wholly-owned subsidiaries, forty-one loan offices located in various cities in the States of Arizona, Colorado, Florida, Illinois, Kansas, Kentucky, Louisiana, Minnesota, Missouri, Nebraska and Nevada, with its principal office in St. Joseph, Missouri.

As a result of increases, the capital stock of Commerce as of July 31, 1957, was $1,696,500.00 of which $446,000.00 was common stock and the balance in various classes of preferred. None of the stock was ever listed on any exchange or traded in the over-the-counter market. Kaufmann and the Feltensteins and the members of their immediate families owned all of the common stock of the Commerce.

The executive management of the business was vested in Kaufmann as Chairman of the Board and Director, Edward D. Feltenstein, President and Director, and Gerald D. Feltenstein, Executive Vice-President and Director. The two

stock acquired in American in exchange for the Stock of Commerce.

"6. a. The firm of Peat, Marwick, Mitchell and Co. did not participate in the negotiations or the bargaining pertaining to the various aspects of the proposed exchange. These negotiations and all legal services rendered in connection therewith were performed by attorneys representing American and by the law firm of Smith, Sherwood, Utz and Litvak, and Basil L. Kaufmann representing the stockholders of Commerce.

"b. The services performed by Peat, Marwick, Mitchell and Co. were:

"1. To research the tax aspect of the proposed exchange of Commerce stock for stock in American;

"2. To consult with the taxpayers concerning the tax problems associated with the various plans under consideration;

"3. To prepare an Application for Ruling, to be filed with the Commissioner of Internal Revenue, concerning the tax aspects of the problem, and to confer with representatives of the Reorganization and Dividend Branch pertaining thereto;

"4. To make a determination of the tax basis of the two classes of stock, received by the stockholders of Commerce, which was exchanged for two classes of stock in American. The services in determining the tax basis were for the purpose of conserving the separate estates of the taxpayers and in assisting them in determining the extent of their tax liability. Copies of the schedules prepared by the accountants are attached hereto and marked Exhibit C and Exhibit D.

"7. The issue for determination in this case is whether the deduction claimed in the taxpayers' Return for professional fees and expenses under the heading Miscellaneous as 'accounting' paid to the accounting firm of Peat, Marwick, Mitchell and Co., in the amount of Four Thousand, Three Hundred and One Dollars and Forty-one Cents ($4,301.41) on November 4, 1957, for services rendered in connection with research and tax consultation, in the review of a proceeding which involved the determination of the extend of tax liability if the proposed exchange of stock of Commerce for American was consummated, and the preparing of the tax schedule covering the tax basis of the American common and preferred stock received in such exchange by the taxpayers, or whether the entire amount should be capitalized as additional cost of the new stock acquired in American in exchange for the stock of Commerce.

"8. Attached as Exhibit E is a copy of the bill dated November 1, 1957 rendered by Peat, Marwick, Mitchell and Co. to B. L. Kaufmann and Edward D. Feltenstein.

"9. Attached as Exhibit F is a copy of a letter dated October 1, 1962, from Peat, Marwick, Mitchell and Co. to Basil L. Kaufmann.

"10. Attached as Exhibit G is a copy of the Application for Ruling for Basil L. Kaufmann, et al prepared by Peat, Marwick, Mitchell and Co.

"11. None of the admissions herein contained are in any way to affect either party, or to be regarded as made except for the purpose of the submission of this controversy."

other directors were officer-employees, who were concerned with the routine operation of the business and did not exercise policy-making functions.

Some time prior to 1957 the three principals decided that it would be advantageous to themselves and to their estates to make a change in their holdings. This decision was made for a number of reasons. They were becoming advanced in age and desired to relieve themselves of the heavy burden of management that they had borne for so long. There was also no one in the organization qualified to assume responsibility in the event of death or disability. The parties further desired that the assets of their estates, which consisted primarily of Commerce stock, be exchanged for stock of easy marketability. In pursuance of this end, negotiations with the American Investment Company were initiated.

American and its subsidiaries operated 409 loan offices in 317 cities in 31 states, and on April 10, 1957, had 4,574,723 shares of common stock outstanding. The prior preferred and common stock is listed on the New York Stock Exchange, and the common is listed on the Midwest Stock Exchange. There is limited but regular trading in the common stock.

As a result of the negotiations, an agreement was entered into under the terms of which all of the common and preferred stock held by the stockholders of Commerce would be exchanged for common and preferred stock of American. The negotiations were largely concerned with the value of the stock of the respective companies. The total transaction involved approximately $6,000,000.00.

Naturally, there was the ever present question of taxation, and consummation of the plan depended to a considerable degree on whether or not the transfer could be made without imposing a prohibitive tax burden upon the owners of the Commerce stock.

Following the signing of the Agreement, Kaufmann and Feltenstein retained the accounting firm of Peat, Marwick, Mitchell & Co., to explore the tax consequences, and to prepare the necessary data and information for submission of the plan to the Reorganization and Dividend Branch of the Tax Ruling Division of the office of the Commissioner of Internal Revenue for a ruling as to whether or not the transfer of stock would be tax free, or subject to taxation as to Kaufmann and the Feltensteins.

The question was duly presented and the ruling of the Bureau was to the effect that the exchange would be tax free. The request for ruling contained 26 pages and 4 schedules. It was presented in explicit detail and conferences were held with representatives of the Internal Revenue Service in Washington. The reply of the commissioner contained 10 pages. Thereafter, the Agreement which had theretofore been executed was carried out and the transfer of stock was made.

Peat, Marwick, Mitchell & Co., submitted a bill for $8,602.81, $7,602.81 of which was for the services in connection with the determination of the tax liability under the agreement for the exchange of the stock, $602.81 of this amount was for out-of-pocket expenses, telephone, travel, blue prints, etc.

The remaining $1,000.00 was for services rendered subsequent to the presentation and ruling to determine the basis of the American stock in the hands of Kaufmann and Feltenstein for future tax income purposes. The accountants took no part in the drafting of the exchange agreement or in the negotiation of its terms.

This amount was paid by Kaufmann and Gerald Feltenstein, and for the taxable year 1957, the plaintiffs took as a deduction on their income tax return, one-half of that amount—$4,301.41. The amount was disallowed by the Bureau, and in due course, the tax was paid and this action was brought.

The section of the statute under which the deduction was claimed, is Revenue Code '54 Title 26 U.S.C. 58 Ed. § 212 and Treasury Regulation 1.212.1 of the

Treasury Regulations on income tax '54 Code, which provides:

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

"(1) for the production or collection of income;

"(2) for the management, conservation, or maintenance of property held for the production of income; or

"(3) in connection with the determination, collection, or refund of any tax."

The Regulation referred to, provides:

"(e) Expenses paid or incurred by an individual in connection with the determination, collection, or refund of any tax, whether the taxing authority be Federal, State, or municipal, and whether the tax be income, estate, gift, property, or any other tax, are deductible. Thus, expenses paid or incurred by a taxpayer *for tax counsel* or expenses paid or incurred in connection with the preparation of his tax returns or *in connection with any proceedings involved in determining the extent of his tax liability* or in contesting his tax liability are deductible." (Emphasis supplied)

It is the Government's contention that:

"The only activities which are recognized as being 'in connection with the determination, collection, or refund of any tax' are those involved in the preparation of tax returns and in the determination and contesting of the extent of the taxpayer's liability." and that the accountants' functions "were not and could not be a determination of *the extent of* the tax liability of the taxpayer."

It is plaintiffs' contention, on the contrary, that the words, "or in connection with any proceedings involved in determining the extent of his tax liability" are applicable in a situation such as we have here, and that the amount was expended for the sole purpose of determining whether or not there would be tax liability incident to the transfer of the stock.

The defendant cites a part of the report of the Ways and Means Committee, (H.Rep. 1337, 83d Cong., 2d Sess., pp. 29, A59 (3 USC Cong. & Adm.News (1954) pp. 4017, 4054, 4196) as follows:

"Existing law allows an individual to deduct expenses connected with earning income or managing and maintaining income-producing property. Under regulations costs incurred in connection with *contests* over certain tax liabilities, such as income and estate taxes, have been allowed, but these costs have been disallowed where the *contest* involved gift-tax liability. A new provision added by your committee allows a deduction for expenses connected with determination, collection, or refund of any tax liability.

\* \* \* \* \* \*

"Paragraph (3) is new and is designed to permit the deduction by an individual of legal and other expenses paid or incurred in connection with a *contested* tax liability, whether the contest be Federal, State, or municipal taxes, or whether the tax be income estate, gift, property, and so forth. Any expenses incurred in *contesting* any liability collected as a tax or as part of the tax will be deductible." (Emphasis supplied)

It is the Government's contention that this legislative history clearly indicates the Congressional intent to limit the provisions of the new paragraph (3) added to Section 212 to actual contested tax liability, and precludes any expenses incident to a determination of tax liability prior to the period when it becomes contested.

■ Legislative history, of course, may be considered by the courts in determining Congressional intent. However, where the legislative history or the Committee Report are not in accord with the clear meaning of the words used in the Act itself, then the court is bound by the clear and commonly understood mean-

ing of the Act and may not consider the Committee Report.

Paragraph (3) seems to be rather clear in its intent when it says, "in connection with the determination, collection, or refund of any tax." The determination is one phase of a tax controversy, the collection is another, and the refund is still another.

The Regulation issued pursuant to this statute follows the language of the statute in using the words, "in connection with the determination of a tax". Further, under the terms of the Regulation, the taxpayer is entitled to deduct expenses paid or incurred in connection with the preparation of his tax return, *"or in connection with any proceedings involved in determining the extent of his tax liability."*

■ The very purpose of seeking the Bureau's ruling was to determine the question of the parties' tax liability under the proposed agreement. It is a matter of common knowledge in the business world that before the consummation of any substantial business transaction, that the resulting tax consequences are uppermost in the minds of those concerned.

I think it could not be disputed that the very purpose of setting up the Reorganization and Dividend Branch of the Tax Ruling Division of the Office of the Commissioner of Internal Revenue was to advise interested parties of the tax liability arising from a reorganization, such as we are dealing with here. It would also seem to be as much of a business expense to determine that question as to determine the actual tax liability after the reorganization.

The parties cite but one case, and I have found no others where this question has been before the courts. It is Davis v. United States, 287 F.2d 168 (Ct.Cl. 1961), on cert. United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335, where the decision of the Court of Claims was affirmed in part and reversed in part.

In that case the taxpayer had taken as a deduction the amount of attorneys' fees which he had paid for tax consultation and advice concerning a property settlement incident to a divorce. There was no ruling by the Bureau, as is the case here. Half of the amount deducted had been paid to his counsel and half to counsel for his wife. The Court of Claims allowed the portion paid to the taxpayer's attorney, but disallowed that paid to counsel for his wife. In ruling on the taxpayer's contention of error on that issue, the Supreme Court said:

"The taxpayer claimed that under § 212(3) of the 1954 Code, 26 U.S.C.A. § 212(3), which allows a deduction for the 'ordinary and necessary expenses paid * * * in connection with the determination, collection, or refund of any tax,' he was entitled to deduct the entire $5,000. The Court of Claims allowed the $2,500 paid taxpayer's own attorney but denied the like amount paid the wife's attorney. The sole question here is the deductibility of the latter fee; the Government did not seek review of the amount taxpayer paid his own attorney, and we intimate no decision on that point. As to the deduction of the wife's fees, we read the statute, if applicable to this type of tax expense, to include only the expenses of the taxpayer himself and not those of his wife. Here the fees paid her attorney do not appear to be 'in connection with the determination, collection, or refund' of any tax of the taxpayer."

Thus the court affirmed the holding of the Court of Claims that the fees paid for tax advice to the wife were not deductible. The Government had the opportunity to raise the issue as to the deductibility of fees for tax advice to the taxpayer but elected not to do so. It contends here, however, that the decision of the Court of Claims was in error on that point.

In view of the quoted language, there is no indication as to what the court

would have done had the question been raised by the Government. Thus, we are without controlling authority and must pioneer in the interpretation of the meaning of the Act.

There is no question here of the reasonableness of the procedure followed by the taxpayers. The problem was an intricate one and created just the sort of situation which the Tax Ruling Division was created to handle. There was a formal presentation, consideration and decision. The ruling handed down by the commissioner is not binding upon him but it is interesting to note the words of the next to last paragraph:

"It is important that a copy of this ruling be attached to the income tax return for each taxpayer involved for the taxable year in which the transaction is consummated."

Had the expenses deducted here been incurred after a disallowance by the commissioner of the exchange as tax free, they would have been clearly deductible.

I do not think that it can be disputed that the commissioner relied upon the ruling. The sole purpose of the expenditure was the computation of the tax liability, if any, which would arise from the exchange.

It is therefore my conclusion that the deduction taken by plaintiffs of the amount paid relative to the determination of their tax liability arising from the exchange, $5,801.41, is within the terms of the statute.

I do not believe that the same legal or factual situation prevails with respect to the $1,000.00 paid for the determination of the tax basis of the stock received. It will be recalled that the services were divided into two parts, one, a determination of the tax liability incident to the exchange of stock, and two, a determination of the basis of the new stock in the hands of the owners.

There was no controversy at that time as to the tax base of the new stock, and the mere fact that the new owners desired that such a determination be made while the accountants were investigating the situation generally, would not justify the deduction of the amount paid for that service. The base was computed for the information of the taxpayers or for some possible future use, and not for the purpose of determining any tax.

It is therefore my conclusion that the deduction of the amount paid for the determination of the basis $500.00, is not within the terms of the statute.

Plaintiffs are therefore entitled to recover so much of the tax and interest paid as relate to the deduction of the cost of the determination of the tax on the exchange and interest thereon from the date paid.