GEORGE L. SCHULTZ AND MARGARET F. SCHULTZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4947-66. Filed July 31, 1968.

*Myles A. Cane* and *Lewis J. Hecker*, for the petitioners.

*Alan M. Stark*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in the joint Federal income taxes of petitioners in the amounts of $32,905.63 and $30,933.35 for the taxable years 1962 and 1963, respectively. After certain concessions by respondent, the following questions remain for our consideration: (1) Whether petitioners may take deductions in 1962 and 1963 for storage charges, insurance, and taxes in connection with the purchase and holding of bulk bourbon whisky; and (2) whether petitioners may deduct certain legal fees paid in 1962.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. Those facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners are husband and wife and had their legal residence in Essex Fells, N.J., at the time the petition herein was filed. They filed timely joint Federal income tax returns on a cash basis for the taxable years 1962 and 1963 with the district director of internal revenue, Newark, N.J. Margaret F. Schultz is a petitioner herein and a party to this proceeding only by reason of having filed a joint return with her husband, George L. Schultz (hereinafter referred to as petitioner).

Petitioner is chairman of the board and chief executive officer of Shulton, Inc., a publicly held corporation engaged in the business of manufacturing toiletry and cosmetic items. He has been with Shulton for over 20 years and devotes full working time to his duties there.

## Issue 1. Costs Incident to Purchase of Bulk Whisky

On November 19, 1962, petitioner purchased from T. W. Samuels Distillery, Inc. (hereinafter referred to as Samuels), warehouse receipts evidencing the ownership of 1,000 barrels of "Fall 1961" bulk whisky and 1,000 barrels of "Spring 1962" bulk whisky. To cover the aggregate purchase price of $134,525.07, petitioner paid Samuels $25,000 in cash, executing and delivering a 6-percent negotiable promissory note for the balance of $109,525.07. On the same day, he delivered to Samuels the warehouse receipts evidencing his ownership of the 2,000 barrels as collateral for the note and, in addition, paid Samuels $26,286, which sum represented interest on the promissory note for the period November 19, 1962, to November 19, 1966. Petitioner claimed a deduction for such interest in determining his taxable income for the taxable year 1962, which has not been disallowed by respondent.

Also on November 19, 1962, petitioner made the following payments to Samuels incident to the whisky purchased: (1) $8,000 for estimated Kentucky ad valorem taxes representing State, county, and school taxes on the bulk whisky from November 19, 1962, to December 31, 1966, based on current assessments and tax rates; (2) $24,000, representing the cost of storing the bulk whisky in a bonded warehouse owned by Samuels for the period November 19, 1962, to November 19, 1966; and (3) $2,800, representing the cost of insuring the bulk whisky against loss for the period November 19, 1962, to November 19, 1966. The storage costs were 25 cents per barrel per month, the customary storage rate charged by Samuels. Casualty insurance premiums

amounted to 35 cents per barrel per year, which cost was very close to the premiums regularly charged Samuels by its insurance carrier.

On November 6, 1963, petitioner purchased from Samuels warehouse receipts evidencing the ownership of 1,250 barrels of "Spring 1962" bulk whisky and 750 barrels of "Fall 1963" bulk whisky. Petitioner paid $25,000 in cash towards the aggregate purchase price of $136,927.27, executing and delivering a 6-percent negotiable promissory note due November 6, 1967, for the balance of $111,927.27. On the same day, the warehouse receipts were delivered to Samuels as collateral for the note, and interest of $26,862.54, covering the period November 6, 1963, to November 6, 1967, was paid. Petitioner claimed a deduction for such interest expense in determining his taxable income for the taxable year 1963, which has not been disallowed by respondent.

Also on November 6, 1963, petitioner made the following payments to Samuels, identical to those made incident to the purchase on November 19, 1962:

| | |
|---|---|
| Kentucky ad valorem taxes | $8,000 |
| Storage | 24,000 |
| Insurance | 2,800 |

The estimated tax payments covered the period November 6, 1963, to December 31, 1967, and the storage and insurance costs covered the period November 6, 1963, to November 6, 1967.

Petitioner at no time discussed any of the terms and conditions or arrangements respecting the foregoing transactions with any representative of Samuels. All discussions were carried on by petitioner's accountant, who, together with petitioner's attorney, advised petitioner regarding the transactions, including the tax consequences thereof.

At the time of the foregoing transactions, petitioner anticipated that he would probably hold each lot of whisky purchased for 4 years because he understood that to be the normal aging period.

In 1962 and 1963, petitioner claimed deductions for those amounts paid Samuels to cover State taxes, storage, and insurance costs. No part of such deductions was allowed by respondent.

Subject to a right of first refusal requiring petitioner to first offer his bulk whisky to Samuels at the "prevailing market price," petitioner was free at any time to sell his whisky in the open market for the highest price he could obtain. The purchase agreement also provided that, in the event Samuels chose not to exercise its right to repurchase and the whisky was ultimately sold to an outsider—

the warehouse receipts representing such whiskey shall, upon delivery to such outsider, be so restricted that no one other than the seller [i.e., Samuels] may use the name T. W. Samuels Distillery, Inc. in any way on the bottled goods which may be produced from such bulk whiskey, nor to have such whiskey iden-

tified by any of the brand names owned by T. W. Samuels Distillery or Old Jordan Distillery.

Petitioner and Samuels had no agreement or understanding at any time prior to the middle of 1965 that Samuels would repurchase any of the whisky from petitioner. Petitioner had no facilities for bottling whisky himself.

On August 20, 1965, Samuels purchased petitioner's 4,000 barrels of bulk whisky in order to fill its inventory shortages in the particular ages of whisky held by petitioner and which it required at that time for bottling purposes. The aggregate sales price paid by Samuels was $381,460.93, which sum included unexpired prepaid costs as follows:

|  | 1962 | 1963 |
|---|---|---|
| Interest | $8,208.90 | $14,863.94 |
| Storage | 7,495.00 | 13,280.00 |
| Insurance | 874.42 | 1,549.33 |
| Taxes | 2,649.93 | 4,553.99 |

Taking into account all expenditures (including interests), petitioner sustained an economic loss of $12,739.95 on purchase, holding, and ultimate sale of the whisky.

Ownership of whisky stored in bonded warehouses is evidenced by warehouse receipts issued by a warehouseman. Such receipts are used in the industry as collateral for private loans and are purchased and sold by distillers, bottlers, distributors, whisky dealers, and investors.

The parties have stipulated that the market price for bulk whisky warehouse receipts is influenced by such factors as supply and demand, age, type, and quality of the whisky, the identity of the distiller, market conditions pertaining to sales of bottled whisky, existing supplies of bulk whisky, geographical location of the distillery, type of water supply, kind of grain, and type of barrels used. During 1962 and 1963, the whisky market was in a relatively depressed state.

Aging typically improves the quality, flavor, and color of bulk bourbon whisky, but this is not always the case. Moreover, despite such improvement, the market value of such whisky may very well decline during the aging process. Thus, for example, although 4-year-old bulk whisky is ordinarily more valuable than 2-year-old bulk whisky at any given point of time, market conditions relating to supply and demand on occasion result in the reverse being the case.

The season and year identifying bulk whisky refers to the date of its distillation. In the bourbon whisky distilling process, a mixture of ground grains containing at least 51-percent corn is cooked with water. Barley malt is added and the mixture is inoculated with yeast, fermented, and distilled under controlled temperature conditions to form whisky. The whisky must then be aged in a bonded warehouse for at

least 2 years in new, charred, white oak barrels. The aging process improves the whisky's flavor; the char of the barrel gives the whisky its amber color. While whisky may be stored for periods of up to 20 years, most bourbon whisky is aged 4 years before being bottled. Four-year-old bourbon whisky is a different product from freshly distilled whisky.

Bottled bourbon whisky can be sold to the public after 2 years of aging; but, if less than 2 years old, such bottles must be labelled "Straight Whisky" as opposed to "Bourbon Whisky." Unaged bourbon whisky (i.e., right off the still) can be sold to the public only as corn whisky. Bulk bourbon whisky—i.e., as was held by petitioner— can be sold at any age directly by its owner or through whisky brokers to distillers, bottlers, or investors.

## Issue 2. Deductibility of Legal Fees

During the calendar year 1962, petitioner paid legal fees in the amount of $4,260 for the following services rendered by Myles A. Cane, Esq.:

| Description | Amount |
|---|---|
| (1) Charitable contributions including valuations and deductibility for Federal income tax purposes | $700 |
| (2) Inter vivos estate planning including analysis of revocable trusts and custodian accounts | 210 |
| (3) Testamentary estate planning including analysis of executor and trustee fees and redraft of will | 2,730 |
| (4) Federal income tax analysis of T. W. Samuels Distillery, Inc., purchase | 420 |
| (5) Investment advice and legal analysis concerning a proposed purchase of an interest in an oil venture | 200 |

During 1962 and 1963, petitioner held an interest in oil and gas properties operated by North Central Oil Corp. In both these years, he reported losses from such interest on Schedule C ("Profit (or loss) from Business or Profession") of his Federal income tax returns.

In the deficiency notice, respondent disallowed claimed deductions of $3,560 (representing items (2), (3), (4), and (5) ) but has since conceded the deductibility of item (4).

### OPINION

## Issue 1. Carrying Charges on Bulk Whisky

Petitioner purchased substantial quantities of bulk whisky and, at the time of such purchases, prepaid 4 years' storage charges, insurance premiums, and State ad valorem taxes attributable to the holding of such whisky. During the taxable years involved herein, petitioner

retained ownership of the whisky but realized no income therefrom. Neither party contends that the whisky was acquired by petitioner other than in his capacity as a private investor and, in any event, we are satisfied that he was such an investor.

Petitioner contends that the above-mentioned "carrying charges" fall within section 212(2) of the 1954 Code [1] in that they were incurred "for the management, conservation, or maintenance of property held for the production of income." As to the ad valorem taxes, he argues that, in any event, these are deductible as such under section 164(a).[2] Respondent's basic thrust is that petitioner sought to acquire 4-year-old whisky and that these expenditures represent the cost of developing freshly distilled whisky into mature, consumable whisky; hence, they should properly be capitalized under section 263.[3]

The effect of section 212 is to create a class of nonbusiness deductions parallel to those business deductions allowed by section 162(a), incurred not in connection with a business, but rather for the production of income or in the management or conservation of property held for the production of income. *Trust of Bingham* v. *Commissioner*, 325 U.S. 365 (1945). There is no requirement that income be currently realized in order for section 212 to be applicable. It is sufficient (and respondent does not argue otherwise) if the taxpayer may realize income in a subsequent taxable year and this is so even where such future income is nonrecurring and involves only gains from the disposition of property. Sec. 1.212-1(b), Income Tax Regs.; see e.g., *Margery K. Megargel*, 3 T.C. 238, 250 (1944). Nevertheless, if a particular expenditure is "capital" in nature, section 212 will not apply, and the taxpayer must await the sale of the particular asset involved before the expenditures are recognized for tax purposes. *Spangler* v. *Commissioner*, 323 F. 2d 913 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; sec. 1.212-1(n), Income Tax Regs.

---

[1] All references hereinafter, unless otherwise stated, are to the Internal Revenue Code of 1954.
SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.
In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

* * * * * * *

(2) for the management, conservation, or maintenance of property held for the production of income; * * *
[2] As applicable to the taxable years before us, this section reads as follows:
SEC. 164. TAXES.
(a) GENERAL RULE.—Except as otherwise provided in this section, there shall be allowed as a deduction taxes paid or accrued within the taxable year.
[3] SEC. 263. CAPITAL EXPENDITURES.
(a) GENERAL RULE.—No deduction shall be allowed for—
(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

We are thus confronted with the necessity of drawing the familiar but often fine line between "capital expenditure" and "expense"—a task which is not resolvable by a "single phrase or rule of thumb" (see *Commissioner* v. *Charleston Nat. Bank*, 213 F. 2d 45, 48 (C.A. 4, 1954), affirming 20 T.C. 253 (1953)) and is especially difficult herein because the factual pattern presents a case of first impression.

Initially, we note that petitioner sought to have the benefit of deductions against ordinary income and long-term capital gain treatment for his ultimate profit. But this blessing, which respondent finds so abhorrent, is sanctioned in many areas of the tax law and certainly does not make petitioner's position *malum in se*. The presence of such a pattern of tax benefits may erect a yellow caution signal on our road to decision. See *Munson* v. *McGinnes*, 283 F. 2d 333, 337 (C.A. 3 1960); cf. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955). But it should not become a red stoplight against the petitioner if the statute permits him the benefits he seeks. Cf. *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962).

Nor does respondent seriously contend that the transactions involved herein were sham or without substance so as to bring them within the purview of *Knetsch* v. *United States*, 364 U.S. 361 (1960), and its progeny.[4] Respondent makes a passing assertion in his brief that petitioner entered into the transactions without any expectation of economic profit, apparently intimating that the doctrine of *Goldstein* v. *Commissioner*, 364 F. 2d 734 (C.A. 2, 1966), affirming 44 T.C. 284 (1965), which, however, respondent does not cite, might be applicable. But whatever may be the ultimate scope of that doctrine, it has no bearing on this case. Here, petitioner's financial success was clearly dependent upon the market value of the whisky at the moment selected for sale—an element which, as our findings of fact reveal, the parties have stipulated is affected by a wide variety of factors. It thus does not appear that petitioner's anticipated financial benefits stemmed solely from the tax benefits to be derived from deductions against ordinary income.[5]

Finally, we do not have before us the question whether petitioner is entitled to a deduction in the years of payment for the entire amount prepaid for the carrying charges. Although this was an issue at the

[4] Respondent has apparently abandoned his intimation at trial that the transactions between petitioner and Samuels were not arm's-length and that resale of the whisky to the latter was contemplated at all times. In any event, his argument to this effect is at best a lame one, and we see no reason to challenge the bona fides of the transactions. The fact that respondent did not disallow, in the year of payment, petitioner's deduction for prepaid interest is further evidence that respondent considered the transactions as having substance.

[5] Petitioner testified that he hoped to sell the whisky at $1.80 to $1.90 per gallon. Ignoring the income tax consequences of the transaction, a sale at the higher figure would have produced an economic profit.

time of trial, petitioner has now conceded on brief that if his expenditures are held to be deductible, they should be prorated over the 4-year period involved.

With the foregoing considerations out of the way, we turn to the narrow issue presented herein—namely, does the fact that bourbon whisky goes through an aging process require that petitioner's expenditures for storage, insurance, and estimated ad valorem taxes be capitalized? Petitioner contends that the aging process was only an incidental element in the determination of the value of the whisky at any point of time and that the types of expenditures involved herein have classically been considered as deductible expenses. Respondent vigorously asserts that these expenditures were incurred for the specific purpose of improving the quality of the whisky and, as a consequence, "added to the value" of the property and should therefore be capitalized.

Clearly, if petitioner's expenditures contributed an added value to the whisky or extended its useful life, the standard test of a capital expenditure would be met. See, e.g., *Cubbedge Snow*, 31 T.C. 585, 593 (1958). Similarly, even if the expenditures had accomplished neither of these results, they still would be deemed capital in nature if they had found their way directly into a "permanent improvement." *Mercantile National Bank at Dallas*, 30 T.C. 84, 95 (1958), affirmed on other issues 276 F. 2d 58 (C.A. 5, 1960); *Hotel Sulgrave, Inc.*, 21 T.C. 619 (1954). On the other hand, the mere fact that the market value of the whisky increased during the period of petitioner's ownership of the warehouse receipts would not preclude the deductibility of the expenditures. The economics of the market place do not per se affect the issue of deductibility versus capitalization. Cf. *Daniel S. W. Kelly*, 23 T.C. 682, 690 (1955), affirmed on other issues 228 F. 2d 512 (C.A. 7, 1956), and *W. N. Fry*, 5 T.C. 1058, 1072 (1945) (both involving safe-deposit box rentals). The criterion is the general purpose of a particular expenditure rather than any incidental results which may flow therefrom. *Perkins Bros. Co.* v. *Commissioner*, 78 F. 2d 152 (C.A. 8, 1935), reversing a Memorandum Opinion of this Court; *Journal of Living Publishing Corporation*, 3 T.C. 1058 (1944); *Godfrey* v. *Commissioner*, 335 F. 2d 82 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court. Viewed in this light, the label on the expenditure is not controlling.

Obviously, the purpose of insurance generally is to protect property against risk of loss. Such expenditures are not normally thought to "add to the value" of the property while it is being held. See *Waldheim Realty & Inv. Co.* v. *Commissioner*, 245 F. 2d 823, 825 (C.A. 8, 1957). Similarly, the purpose of storage charges generally is to pro-

vide for the physical protection of the property. If the property qualifies as business or investment property, such expenditures are normally considered to be deductible expenses. *Higgins* v. *United States*, 110 Ct. Cl. 204, 75 F. Supp. 252 (1948) ; cf. *McIntosh Mills*, 9 B.T.A. 301 (1927). See also, *George C. Peterson Co.*, 1 B.T.A. 690, 693 (1925). However, if these expenditures are essential ingredients of the cost of acquiring property, they are not deductible but are required to be capitalized. *Herbert Shainberg*, 33 T.C. 241 (1959).

In the foregoing context, we turn to an examination of the nature of the whisky which petitioner purchased and what his purpose was at the time of acquisition. At any given point of time, 4-year-old bourbon is ordinarily more valuable than 2-year-old bourbon, which in turn, is more valuable than straight or unaged whisky. The cause of this added value is not the passage of time alone but the passage of time coupled with a chemical change in the whisky itself. Granted that no external activity or expenditure brought about that change,[6] it is undeniable that the change occurred and that a different product resulted. This conclusion is confirmed by the different labeling requirements as they relate to the age of the whisky and by the fact that bourbon whisky is usually aged for 4 years before being bottled. Petitioner's claim that "whisky is whisky is whisky" is too facile for us to accept under the circumstances herein.

If we examine petitioner's purpose, it is clear that he sought to acquire 4-year-old bourbon. He testified that he anticipated holding the whisky for a 4-year period. He paid insurance, storage charges, and estimated ad valorem taxes for 4 years in advance. His testimony and action are confirmed by the objective facts relating to the aging process and its effect on value which are set forth in our findings and to which we have already referred.

Petitioner relies heavily upon *Higgins* v. *United States*, *supra*, where an investor in turpentine was permitted to deduct storage and insurance charges under the predecessor of section 212. But *Higgins* involved purely custodial charges with respect to a product that apparently remained in its original state. There is no indication in that case that turpentine is subjected to any aging process or that its characteristics change in any way with the passage of time.[7] Thus, *Higgins* is clearly distinguishable. We think this case is more closely

---

[6] There is no indication in the record herein that any human or mechanical action to treat the whisky took place while it was in the warehouse.

[7] It would appear that variations in the qualities of turpentine derive from differences in the basic raw materials and in the applicable method of distillation. Once the distillation process is completed, the chemical qualities of the turpentine remain constant except to the extent of changes (which do not seem to produce any improvement in quality) brought about by exposure to air and resultant oxidation. 14 Encyclopedia of Chemical Technology 381–397.

akin to *Herbert Shainberg, supra*, relied upon by respondent, where insurance costs and other charges during the period of construction of a building were required to be capitalized. Admittedly, petitioner's whisky was a more salable commodity at any point of time during the anticipated 4-year holding period than was the unfinished building involved in *Shainberg*, but, as we see it, that is not a material distinction. In *Shainberg*, the taxpayer sought to acquire a finished building which was a different product from the property he initially acquired. In the instant case, petitioner sought to acquire 4-year-old whisky which was a different product from the whisky which he initially acquired.

Thus far, we have confined our discussion to petitioner's expenditures for insurance and storage charges. His expenditures for estimated Kentucky ad valorem taxes are superficially in a different category because of the provisions of section 164 which specifically allow a deduction for such taxes. Petitioner would be entitled to deduct such taxes if he were liable for the payment thereof and if he in fact paid them. *United Mercantile Agencies, Inc.* (docket No. 40028), 23 T.C. 1105, 1117 (1955) ; cf. *William F. Armentrout*, 43 T.C. 16 (1964). We see no need to dissect the various provisions of Kentucky law in order to determine whether the liability for such taxes was imposed upon petitioner or the warehouseman or both or whether the taxes could be assessed against petitioner's whisky. Compare Ky. Rev. Stat. Ann., secs. 132:020, 132:130, 132:180, and 134:420 (1963) ; cf. *National Distillers Prod. Corp.* v. *Board of Education*, 256 S.W. 2d 481, 485 (Ky. App. 1952). The fact of the matter is that there is no evidence in the record before us that the taxes were actually paid to the taxing authority either by petitioner or Samuels as his agent for that purpose, a necessary prerequisite to a right to a deduction under section 164. *United Mercantile Agencies, Inc., supra.* As far as the record shows, petitioner did no more than pay *to Samuels*, at the time of purchase, an amount equal to the Kentucky ad valorem taxes which the parties estimated would accrue during the ensuing 4-year period. In this connection we note that under Kentucky law it was not necessary that the ad valorem taxes be paid to the taxing authority until either the Federal tax had been paid or the whisky had been withdrawn from bond. Ky. Rev. Stat. Ann., sec. 132:160.

In the posture of this case, petitioner is remitted to justifying his deduction for the estimated Kentucky ad valorem taxes as an expense under section 212—a path which is open to him, despite the fact that section 164 is inapplicable. Sec. 1.164–2(f), Income Tax Regs. Such being the case, the standards against which deductibility should be measured are the same as those applicable to the expenditures for in-

surance and storage charges. Clearly, the payment of the estimated taxes did not directly "add to the value" of the whisky. But it did enable petitioner to accomplish his objective of acquiring 4-year-old bourbon.

We are not unmindful, as petitioner points out, that a cash basis cattle owner or crop grower is permitted to expense the cost of raising his livestock or crop even though he may be entitled to capital gains treatment on the profit from the sale thereof. But the fact that respondent conceivably may have painted himself into a corner in these areas does not require us to put him in the same position in other areas, where the underlying considerations are quite different. See Hawkinson, "Farm Expenses and General Accounting Principles," 22 Tax L. Rev. 237 (1967) ; Hearings on the Revenue Act of 1964 before the Committee on Ways and Means of the House of Representatives, 88th Cong., 1st Sess., pp. 144, 451 (Part 1) (1963) ; cf. sec. 1.162-12, Income Tax Regs.; cf *Olin Bryant*, 46 T.C. 848, 860 (1966), on appeal (C.A. 5, Apr. 5, 1966).

It may be claimed that the test of section 263 has not technically been met on the ground that the amounts were not "paid out * * * for permanent improvements or betterments made to increase the value of any property or estate." In point of fact, we think that any such claim is misplaced because the amounts paid by petitioner did make possible an improvement—and a permanent one at that. But, even if this were not the case, it does not follow that such amounts would therefore be deductible expenses. We are still required to consider an intermediate question, namely, whether petitioner's expenditures should properly be considered as acquisition costs and therefore part of the basis of the whisky under section 1012. The fact that respondent may not have asserted this particular section or precisely articulated the "acquisition cost" rationale does not bar us from disposing of this case on such a basis. Both his deficiency notice and his arguments on brief were broad enough to have put petitioner on notice of this alternative approach and to have afforded him ample opportunity to respond. In any event, it is well established that a determination by respondent may be sustained on grounds other than those urged by him; the only requirement is that the determination be legally correct. See *Blansett* v. *United States*, 283 F. 2d 474, 478 (C.A. 8, 1960) ; *Bernstein* v. *Commissioner*, 267 F. 2d 879, 881 (C.A. 5, 1959) ; *Irish* v. *Commissioner*, 129 F. 2d 468, 470 (C.A. 3, 1942). Nor does the fact that *Herbert Shainberg*, *supra*, involved a new building, and thus technically fell within the ambit of section 263, preclude us from applying its rationale in determining whether the expenditures herein were costs of acquiring the whisky.

To recapitulate, the situation herein fits neither the classic pattern of capital expenditure nor deductible expense. Petitioner's expenditures in and of themselves did not add to the value of the whisky. But they certainly provided the opportunity for a "permanent improvement" in the whisky. The change in the whisky did not occur simply because of extraneous factors, economic or otherwise. It is clear that petitioner did not simply purchase property intending to hold it in order to reap whatever benefits might accrue merely from the passage of time. He bought a product with the objective of holding it until it was changed into another product by inherent qualitative reactions which occurred as time elapsed. This is not a case where the ascertainment of petitioner's objective rests on a probing of conflicting evidence in order to determine his subjective intention. On the contrary, petitioner's objective is confirmed both by his own affirmative testimony and independent factors revealed in the record. When all is said and done, the product which petitioner sought to acquire (4-year-old bourbon) was different, as a result of chemical changes therein, from the product he originally purchased (raw whisky). The mere fact that, as it turned out, petitioner sold the whisky prior to the expiration of the 4-year period does not dictate a different conclusion.[8]

The question is a close one, but, under the circumstances herein, we hold that petitioner sought to acquire 4-year-old bourbon whisky and that the expenditures for insurance, storage charges, and estimated Kentucky ad valorem taxes are required to be capitalized and are not deductible as expenses under section 212. Cf. I.T. 3240, 1938–2 C.B. 140; A.R.R. 140, 2 C.B. 55 (1920); Karrenbrock and Simons, Intermediate Accounting 450–451 (3d ed. 1958)

### Issue 2. Deductibility of Legal Fees

Respondent disallowed the following legal fees paid by petitioner in 1962:

(a) Inter vivos estate planning including analysis of revocable trusts and custodian accounts_____ $210

(b) Testamentary estate planning including analysis of executor and trustee fees and redraft of will_____ 2,730

(c) Investment advice and legal analysis concerning a proposed purchase of an interest in an oil venture_____ 200

Petitioner contends that all of the above expenditures are deductible under section 212, either because they were incurred for the "management, conservation, or maintenance of property held for the production of income" (sec. 212(2)) or, alternatively, "in connection with the

---

[8] Neither party has sought to draw any distinction between the different batches of whisky acquired and held by petitioner.

determination, collection, or refund of any tax" (sec. 212(3)). See sec. 1.212–1(a)(1), Income Tax Regs.

The record herein is devoid of any evidence as to the details of the legal services rendered. As to the $200 charge, the attorney merely stated that it represented a luncheon conversation in which prospective investments, including an oil venture, were discussed. With respect to the other charges for estate planning, the attorney testified only that he did extensive work on analyzing comparative executors' and trustees' fees as between New York and New Jersey for the purpose of preparing or contemplating revisions of petitioner's existing will and in redrafting the will. In all probability, such services to some degree represented estate-planning tax advice. But, clearly, services of a personal nondeductible nature such as the preparation of petitioner's will (*Estate of Helen S. Pennell*, 4 B.T.A. 1039 (1926)) were also involved. The record herein furnishes no basis for an allocation. Such being the case, we cannot determine to what extent the services included estate planning of the type which might give rise to a deductible expense under section 212. *Nancy Reynolds Bagley*, 8 T.C. 130 (1947). Nor do we have a sufficient basis to justify delving into the apparently unsettled question of the scope of section 212(3). Compare *Carpenter* v. *United States*, 338 F. 2d 366 (Ct.Cl. 1964), with *Kaufmann* v. *United States*, 227 F. Supp. 807 (W.D. Mo. 1963).

Under all the circumstances, we hold that the petitioner has failed to carry his burden of proof. Therefore, we sustain respondent on this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

————

FEATHERSTON, *J.*, dissenting: With deference, I dissent.

Section 212 of the 1954 Code provides that "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred * * * for the management, conservation, or maintenance of property held for the production of income." It is not disputed that the expenses incurred by petitioner would fall within section 212, but for the issue of whether they should be capitalized. The majority opinion holds that petitioner's expenditures are capital either because they fall within the scope of section 263, or because they were part of the "acquisition cost" of 4-year-old whisky and therefore must be capitalized under section 1012.

Section 263 provides that certain expenditures are to be capitalized if they are "paid out * * * for permanent improvements or betterments made to increase the value of any property." The majority

concedes that petitioner's expenditures "in and of themselves did not add to the value of the whisky." Yet, the majority concludes, the expenditures "provided the opportunity for a 'permanent improvement' in the whisky" through chemical change, and thus must be capitalized. Unfortunately, the majority, preoccupied with the "chemical change" reflected by improvements in the "quality, flavor, and color" of the whisky, has, I believe, lost sight of the fact that, while the aging process might well improve bulk whisky from a *consumer's* standpoint (a taste test), the statute requires an examination of the facts from an *investor's* standpoint (an economic test), i.e., whether the improvements or betterments were made "to increase the value" of the property.

It is quite clear from the record that petitioner purchased the bulk whisky as a speculative investment; he was not concerned about the flavor, color, or classification of the whisky when bottled for retail sale. Rather, his sole concern was to make a profit through resale of the bulk whisky when the market was right, and the market was controlled by supply and demand. It is erroneous, I believe, to require petitioner to capitalize his investment under section 263 because of a chemical change having no necessary effect on the bulk whisky *as an investment.*

Nor do I find section 1012 applicable. That petitioner intended to hold his bulk whisky until it was 4-year-old whisky does not mean that he intended to purchase 4-year-old whisky. The clear purport of his testimony is that he intended to purchase an asset which he believed would be more valuable in the future. From the moment he acquired the whisky he was free to sell it. Quite clearly, market appreciation was the factor influencing his decision. I believe this case falls squarely within the ambit of *Higgins* v. *United States*, 75 F. Supp. 252 (Ct. Cl. 1948) : "[T]hese insurance and storage charges are not a part of either the purchase or sale transactions * * *. They are expenses incurred between the time the purchase transaction was completed and the sales transaction was begun. Their proper classification is as ordinary and necessary expenses rather than as capital items." *Id.* at 255.

In *Herbert Shainberg*, 33 T.C. 241 (1959), relied on by the majority, the taxpayer was a member of a partnership formed to construct and operate a shopping center. The partnership hired a contractor to perform the work on a cost-plus basis. The partnership incurred certain expenses for sales tax, accounting services, cleaning services, and insurance as part of the job costs pursuant to the express terms of the construction contract. We held that these costs, quite clearly part of the contract price for a completed shopping center, were to be capitalized,

since they were obviously an integral part of the cost of acquiring the asset intended to be purchased. Unlike *Higgins* v. *United States, supra,* and the instant case, the expenses were concededly part of the contracted acquisition cost of a capital asset.

I recognize, of course, that there are certain expenditures which are nondeductible under sections 162 or 212 because capital, even though not specifically covered by section 263 or 1012. See *Spangler* v. *Commissioner,* 323 F. 2d 913, 919 fn. 13 (C.A. 2, 1963). Thus, where the improvement is of the type which will benefit the property for an extended period, the outlay is not an "expense" within either section 162 or 212, and it will be capitalized even if the fair market value of the asset is not increased thereby. See *Mercantile National Bank at Dallas,* 30 T.C. 84, 95 (1958), affirmed on other issues 276 F. 2d 58 (C.A. 5, 1960) ; *Hotel Sulgrave, Inc.,* 21 T.C. 619 (1954). But petitioner's expenditures here—for insurance, storage, and ad valorem taxes—are of the kind which occur annually, and their benefit to the property is clearly transient. I believe that petitioner is entitled to deduct these expenditures under section 212 as the ordinary and necessary expenses of maintaining or conserving his investment in bulk whisky.

DRENNEN and FAY, *JJ.,* agree with this dissenting opinion.